## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

BOBBY SNEED,

        Plaintiff,

   v.

FRANCIS ABBOTT, TONY MARABELLA, SHERYL RANATZA, JIM WISE, PEARL WISE, and ALVIN ROCHE, JR.,

        Defendants

No. 3:21-cv-00279-JWD-RLB

**FIRST AMENDED COMPLAINT**

## COMPLAINT

Plaintiff BOBBY SNEED, by his undersigned attorney, for his complaint against Defendants, alleges as follows:

### INTRODUCTION

This case involves a bizarre and lawless parole revocation unlike any other in Louisiana history. After spending nearly 47 years in Louisiana State Penitentiary (LSP) for serving as a "lookout" to a burglary-gone-wrong, a frail and infirm 74-year-old Bobby Sneed unanimously won his parole on March 15, 2021. Prison authorities moved slowly in processing his release, and each day that passed, Mr. Sneed's health grew worse. Already having suffered a stroke in LSP custody in years past, Mr. Sneed developed COVID-19, pneumonia, sepsis, and hypoxia. His release was fixed for March 26, 2021. But less than 24 hours from that moment, on the afternoon of March 25, 2021, Mr. Sneed collapsed and was rushed to a nearby hospital. Upon return to LSP four days later, he was placed in "Administrative Segregation."  Based on a urine sample that may (or may not) have been extracted from an unconscious Mr. Sneed, prison

officials alleged that Mr. Sneed possessed contraband (i.e., drugs) that caused his collapse. Mr. Sneed's release date came and went, with no action from LSP.

Mr. Sneed spent over a month in a portion of LSP known as "the Dungeon," without his artificial teeth or shoes, before getting his administrative hearing. After a three-hour Disciplinary Board hearing on Wednesday, May 6, 2021, a panel of prison officials cleared Mr. Sneed of all wrongdoing related to his March 25, 2021 medical emergency. (At the close of the hearing, the Disciplinary Board announced a *new* charge against Mr. Sneed of improperly being in the wrong dormitory when he collapsed, but they withdrew those charges the next day, after LSP officials realized Mr. Sneed had every right to be in the dormitory.) Mr. Sneed and his family rejoiced at the Disciplinary Board's ruling(s): Mr. Sneed was once again due to return home to spend his final years with his siblings, children, and grandchildren.

Then came a cruel twist. Two days after the LSP Disciplinary Board hearing—after numerous news articles portrayed Louisiana corrections officials in a harsh light for their handling of Mr. Sneed's release—Mr. Sneed received notice that his parole had been revoked. He received a second notice that he would have a "new parole hearing" on May 10, 2021. In the middle of this "new parole hearing," the Committee on Parole informed Mr. Sneed that (perhaps) his previously granted parole had been temporarily restored. But the fix was already in: as the panel members aggressively cross-examined him, it became clear (1) that the Committee on Parole had already made their decision, (2) that its members were apparently under the (incorrect) impression that Mr. Sneed had suffered an overdose on March 25, 2021, notwithstanding the Disciplinary Board's exoneration, and (3) that its members believed Mr. Sneed told hospital staff that he had injected heroin before his "overdose." Mr. Sneed was given no notice; no meaningful opportunity to prepare with counsel; no opportunity to present

evidence; and no access to the secret "information" upon which the Committee on Parole was acting. The Committee on Parole called no witnesses and introduced no evidence, and Bobby was denied the opportunity to call any witnesses himself. At the end of the brief proceeding, the panel voted to "deny parole," effectively condemning Bobby to die in prison.

The next day (Tuesday, May 11, 2021), Louisiana prison officials finally turned over the disputed medical records they had withheld from Mr. Sneed for nearly a month. The records confirmed that Mr. Sneed was hospitalized due to "Post Cardiac Arrest, Covid, Pneumonia, Hypoxia." Moreover, the records confirmed (as Mr. Sneed has repeatedly stated) that he was essentially unconscious and unable to communicate with medical staff at the time he purportedly "confessed" to medical staff that he had used drugs.

The Committee on Parole's actions were illegal. In a rush to condemn an elderly man, the parole board disregarded its own procedures, violating both state and federal law. Mr. Sneed seeks declaratory and injunctive relief requiring Louisiana prison officials to comply with the Fourteenth Amendment's Due Process Clause and the First Amendment.

## JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiffs' rights as secured by the United States Constitution. *See Wilkinson v. Dotson*, 544 U.S. 74 (2005) (holding prisoner may bring § 1983 due process claim challenging parole procedures).

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3.    Venue is proper under 28 U.S.C. § 1391(b), because the defendant resides in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

4.      Plaintiff BOBBY SNEED is a citizen of the United States and resides at Louisiana State Penitentiary in West Feliciana Parish, Louisiana.

5.      Defendant FRANCIS ABBOTT is the Executive Director of the Louisiana Committee on Parole.

6.      Defendant TONY MARABELLA is a Member of the Committee on Parole, purported to unilaterally revoke Mr. Sneed's parole on May 7, 2021, and then served as a member of the five-person committee that purported to revoke Mr. Sneed's parole on May 10, 2021.

7.      Defendant SHERYL RANATZA is the Chair of the Louisiana Committee on Parole and served as a member of the five-person committee that purported to revoke Mr. Sneed's parole on May 10, 2021.

8.      Defendant JIM WISE is the Board Vice Chair of the Louisiana Committee on Parole and sat on the five-member panel of the Committee that purported to revoke Mr. Sneed's parole.

9.      Defendant PEARL WISE is a member of the Louisiana Committee on Parole and sat on the five-member panel of the Committee that purported to revoke Mr. Sneed's parole.

10.      Defendant ALVIN ROCHE, JR. is a member of the Louisiana Committee on Parole and sat on the five-member panel of the Committee that purported to revoke Mr. Sneed's parole.

## PLAINTIFF'S FACTUAL ALLEGATIONS

**A.      Bobby's History and the Underlying Offense**

4

11.     According to documents presented at Mr. Sneed's March 15, 2021 parole hearing,

*see* Ex. A ("Parole Packet"), Bobby Sneed lived a commendable life up through the date of his

offense:

> Mr. Sneed was born on December 18, 1946. He was raised in Gibsland, Louisiana, which is located in Bienville Parish. His grandmother raised him because he was the second of nine children born to a single mother who struggled to support her children. Though his family was poor, and life was tough, Mr. Sneed graduated high school and earned a musical scholarship to Grambling College for playing the saxophone. Although he excelled in the university, Mr. Sneed left Grambling in 1966, with only 30 credits shy of graduating.
>
> In 1966, Mr. Sneed was drafted into the Army and was sent to Vietnam. He served his tour and was honorably discharged in 1968. However, when Mr. Sneed returned from Vietnam, his family reports that he was not the same carefree individual. Instead, Mr. Sneed was always on the defense, he was more aggressive, and much more emotional than before. He seemed to have lost the outgoing and happy outlook on life that he once had…
>
> Other than the offense for which he is incarcerated, Mr. Sneed has no other criminal history.
>
> Since arriving at Louisiana State Penitentiary, Mr. Sneed made personal and educational strides to better himself, which is apparent in his character today. During more than four decades of incarceration, Mr. Sneed studied the law, participated in rehabilitative programs, and strengthened his spiritual beliefs to grow into a well-educated and respectable man. He is entering the final years of his life and recently suffered a stroke. Despite health complications, Mr. Sneed is optimistic to return to society and spend his final years with his family.

12.     But in 1974, the parole hearing documents reveal, Mr. Sneed made a horrible

mistake:

> Mr. Sneed lived in Chicago for a short period of time where he made a few friends. In June [of 1974], three of Mr. Sneed's Chicago friends came to Gibsland, Louisiana, to visit and were looking to hustle some money. Some of the men had heard that an elderly couple had a safe with a lot of money. On June 13, 1974, Mr. Sneed and his five co-defendants decided to rob the Jones's house for the money in their safe. Charles Sneed, Eugene Wright, and Arthur Gardner entered the residence to carry out the robbery while Bobby Sneed and Andrew Rhodes stood about two blocks away as lookouts. Alfred Critton drove the car the men used to leave the scene of the crime. While the three co-defendants were inside one of them beat Mr. Jones to death.
>
> All six men were arrested. Mr. Sneed went to trial in 1975 and was convicted as a principal to second-degree murder and sentenced to life with parole after 40 years. Mr. Sneed filed a postconviction application, and his conviction was vacated. In 1987,

he was tried for the same crime and again convicted as a principal to second-degree murder and sentenced to life without parole [sic].

It is undisputed that Mr. Sneed did not enter the Jones' residence and acted as a lookout.

Of the six men originally arrested for this crime, Mr. Sneed is the only one who is still incarcerated. Two of Mr. Sneed's co-defendants agreed to testify and served no time. One codefendant struck a deal with the state at the time of Mr. Sneed's second trial and received a reduced sentence. One co-defendant died in prison and Charles Sneed was released on parole.

Mr. Sneed recognizes that his actions make him just as culpable as the individuals who entered the Jones' home. By acting as a lookout, participating in this crime, and failing to intervene, Mr. Sneed acknowledges that he caused irreparable damage and deeply regrets his participation in this crime.

13.     For the past 47 years, the documents reflect, Mr. Sneed has engaged in extensive prison programming, and undergone substantial spiritual and personal growth. He has a lengthy record of institutional compliance and poses a low risk of recidivism.

**B.     After 47 Years, Parole Finally Granted**

14.     Bobby Sneed came before the Committee on Parole on March 15, 2021.

15.     After a hearing that lasted less than 17 minutes, during which Mr. Sneed's parole application faced no opposition, Mr. Sneed was granted parole. Many of the members thanked Mr. Sneed for his military service, and heaped praise on him for his self-improvement work while in prison. At the end of the hearing, after a 5-0 vote in favor, the panel chairman stated: "Your parole has been granted."

 

*Mr. Sneed – Before and After Nearly a Half-Century of Incarceration*

### C.    Within 24 Hours of Freedom, A Medical Crisis

16.    The Louisiana Department of Corrections continued to hold Mr. Sneed at Louisiana State Penitentiary even after the parole board voted and his residential plan was approved. Indeed, the matter was fully out of the Committee on Parole's hands: the Certificate of Parole had been sent to LSP, and absolutely nothing (except bureaucratic delay from LSP officials) prevented Mr. Sneed's immediate release.[1]

17.    Then, on March 25, 2021, Mr. Sneed collapsed at Louisiana State Penitentiary. He was revived after other prisoners successfully performed CPR and he received two defibrillations.

---

[1]    The over-detention of prisoners by the Louisiana Department of Corrections has been a "big problem" since at least 2012, which has costed taxpayers millions of dollars (and incarcerated people thousands of years of "extra" time unlawfully detained in prison). *See, e.g.,* Lea Skene and Jacqueline DeRobertis, *State corrections overdetention woes, known since 2012, cost state millions, lawyer alleges*, BATON ROUGE ADVOCATE, Feb. 6, 2020.

18.    Medical records subsequently revealed that he was suffering from COVID-19, pneumonia, sepsis, and hypoxia at the time of his collapse. Consistent with the fact that medical staff did not believe he suffered an "overdose," doctors at LSP injected Mr. Sneed with morphine before taking him to an outside hospital.

19.    As is common practice at LSP (though improper from a medical care perspective), prison officials also administered Narcan and inserted a catheter into Mr. Sneed's urethra to attempt to drug test him.[2]

20.    Mr. Sneed was taken to Lane Regional Medical Center, where he was treated until March 29, 2021.

21.    Instead of being released when he was discharged from the hospital, Mr. Sneed was forcibly returned to Louisiana State Penitentiary.

22.    Mr. Sneed was placed in "Administrative Segregation," and told that he would remain there until adjudication of the prison disciplinary allegations against him—allegedly violating LSP "Rule 1 (Contraband)" on March 25, 2021.

**D.    Fighting the Allegations from "the Dungeon" for Over a Month**

23.    For over a month, Mr. Sneed attempted to ascertain the evidentiary basis for the Contraband allegation against him.

---

[2]    On March 31, 2021, just days after Mr. Sneed's heart attack, a federal judge held that Louisiana State Penitentiary defendants were deliberately indifferent to the inmates' serious medical needs in the means and manner of the delivery of health care, in violation of the Eighth Amendment to the United States Constitution. *Lewis v. Cain*, 3:15-cv-00318, Dkt. 594 (Opinion) (M.D.La. 3/31/21). As part of that opinion, the District Court highlighted LSP's practice of unnecessarily, unprofessionally "(1) routine[ly] treat[ing] patients presenting with altered mental status with Narcan; [and] (2) routine[ly] subjecting patients who present with altered mental status to urine toxicology testing, often by catheterization." *Id.* These policies and others violate the Eighth Amendment." *Id.*

24.     On April 18, 2021, Mr. Sneed signed a legal release, provided by LSP, to share his medical records with his attorney.

25.     DPSC officials refused to release the documents to his attorney until May 11, 2021 (i.e., after the Disciplinary Board hearing and after the parole board proceeding confirming the revocation of Mr. Sneed's parole).

26.     From late March until the end of April, LSP officials regularly failed to make Mr. Sneed available for scheduled attorney-client calls; refused to allow Mr. Sneed's attorney to attend (or even know about) scheduled Disciplinary Board hearing dates on March 30, April 5, April 6, and April 8; failed to fulfill Public Records Act requests for relevant records; and failed to disclose the "evidence" supporting the allegations against Mr. Sneed. *See, e.g.,* Ex. B (letter dated April 27, 2021).

27.     Finally, after numerous protests, Mr. Sneed was afforded an opportunity to appear before the Disciplinary Board with counsel on May 6, 2021.

28.     Throughout this period, the Committee on Parole took no action with respect to Mr. Sneed's parole and DPSC refused to honor the previously fixed release date of March 26, 2021.

**E.      Exonerated by the Disciplinary Board**

29.     At the outset of the hearing, the Disciplinary Board denied every motion Mr. Sneed filed, including *inter alia* (1) a motion to dismiss for failure to comply with the "72-hour rule" for promptly adjudicating Disciplinary Board allegations (*see* La. Admin. Code, Title 22, Part I-B, § 341(J)); (2) a motion to dismiss for failure to comply with the notice requirement (*see id.*, § 341(F)(1)(a)); (3) a "Motion to Confront Accuser, to Call Witnesses, and for Further Investigation" that included additional requests to review medical records *See* Ex. C, D, E.

30.     The Disciplinary Board then read into the record the chief evidence against Mr. Sneed: a presumptive positive test from a "ToxCup" urine test for amphetamine and methamphetamine from March 25, 2021, and a subsequent laboratory test of that sample suggesting the additional presence of opiates. Mr. Sneed was then given the opportunity to present evidence. He introduced evidence indicating LSP officials (1) fraudulently altered their "ToxCup" forms in Mr. Sneed's case[3]; (2) mishandled the urine samples before they were sent to an outside laboratory; and (3) had no idea how, when, or if the purported urine sample was obtained from an unconscious Mr. Sneed. Mr. Sneed testified that he had almost no memories from March 25, 2021 because he was unconscious for most of the day.

31.     Because Mr. Sneed's medical records were withheld, Mr. Sneed had no opportunity to argue that other medications he was prescribed were responsible for generating any false positive results, if in fact that urine was obtained from him. For instance, prison officials concealed (until May 11, 2021) that they injected Mr. Sneed with morphine before taking him to an outside hospital, which explains any opiates in his urine; many other drugs commonly administered to treat diabetes, high blood pressure, sinus and nasal congestion, and pneumonia can result in false positive tests for amphetamine and methamphetamine.

32.     At the conclusion of the hearing, the Disciplinary Board deliberated in private. After approximately ten minutes, they delivered their verdict: Mr. Sneed was found not guilty of "Contraband."

33.     In the same breath, the Disciplinary Board also announced the filing of a new baseless charge against Mr. Sneed—being impermissibly present in the dormitory where Mr.

---

[3]   LSP officials were unaware that Mr. Sneed's counsel had independently obtained the original versions of the reports, which were different in several material ways from the "cleaned up" versions later submitted as evidence to the Disciplinary Board.

Sneed collapsed on March 25, 2021. LSP officials withdrew that charge the next day when they were forced to acknowledge Mr. Sneed was authorized to be there.

### F.    Francis Abbott's Threats and Improper Plea Bargaining

34.    Executive Director of the Committee on Parole Francis Abbott was aware of the allegations against Mr. Sneed beginning at least March 31, 2021.

35.    On the evening of May 6, 2021, Mr. Sneed's attorney emailed the Executive Director of the Committee on Parole, Francis Abbott (copying DPSC's General Counsel):

> Dear Mr. Abbott: It is my understanding that the Parole Board has voted to grant Mr. Sneed parole, his addresses with Parole Project and the First 72+ have been approved, and that all disciplinary charges against him have been dismissed (the contraband charge after having been fully adjudicated). Can you please advise when he will be released? We are standing by to arrange pickup. Many thanks, Thomas

36.    Later that evening, Mr. Abbott called Mr. Sneed's attorney via cell phone. He stated that he had the authority to revoke Mr. Sneed's parole despite the Disciplinary Board finding. When Mr. Sneed's attorney advised that he believed Louisiana law required, at minimum, a formal "notification" of misconduct from the Secretary of the Department of Public Safety & Corrections, *see* La. Admin. Code Title 22, Part XI, § 504(K), Mr. Abbott seemed confused, asking which provision Mr. Sneed's attorney was referring to. He stated he would "check with the Attorney General's office about that."

37.    Mr. Abbott stated that because he was in possession of evidence of Mr. Sneed's misconduct, he "didn't need" notification from the Secretary.

38.    Mr. Abbott proposed that "what [he] want[ed] to do" is for Mr. Sneed agree to "go to Steve Hoyle" for a nine-month drug treatment program in Department of Corrections custody, during which time the Committee on Parole would "keep the matter open." Depending on Mr. Sneed's behavior during those nine months, Mr. Abbott indicated, Mr. Sneed might re-

earn his parole. Mr. Abbott proposed that by agreeing to this compromise, Mr. Sneed could resolve all his issues with the Committee on Parole.

39.     Counsel for Mr. Sneed advised that private charities in New Orleans had agreed to pay for 100% of any in-patient or out-patient drug treatment the Committee on Parole or his parole agent might require, when Mr. Sneed was released. *See also* Ex. B (same). Moreover, he did not think Mr. Abbott had the authority to engage in such negotiations on behalf of the Committee on Parole, and that any decision would have to be Mr. Sneed's, with whom he had limited communication. *See id.*

40.     During the Thursday night call, Mr. Abbott referred derisively to the ongoing press coverage of Mr. Sneed's case and stated it would not help Mr. Sneed before the Committee on Parole. He asked to be notified if the *Wall Street Journal* was planning on covering the matter.

41.     No agreement was reached, and counsel had no opportunity to communicate Mr. Abbott's proposal to Mr. Sneed before the next day's events.

42.     Mr. Abbott was aware of negative press coverage, and critical statements by Mr. Sneed's counsel about Louisiana corrections officials, beginning at the latest May 6, 2021. At the time, news coverage of Mr. Sneed's ordeal was generating substantial negative publicity about Louisiana corrections officials. A story had garnered well over 150,000 "views" on the news and politics website Reason.com, a New York City radio station devoted a 30-minute segment to Mr. Sneed's matter, and online reaction to Louisiana corrections officials' actions was overwhelmingly hostile. *See* Ex. F (letter dated May 7, 2021 to Committee on Parole collecting sample of online comments). On behalf of Mr. Sneed, his attorney made critical statements about Louisiana corrections officials, and was encouraging others to petition Secretary LeBlanc. *See,*

*e.g.,* Billy Binion, *He Was Granted Parole After Service 47 Years Behind Bars. Now the Prison Won't Let Him Leave.* REASON, MAY 6, 2021 ("It feels like we've gone from tragedy to farce now.").

43.     One of Mr. Sneed's family members agreed to talk with journalists, but only if their name and gender was masked. *See* Nicholas Chrastil, *Angola Prison Who Faced Loss of Parole Cleared on Contraband Charges, but Now Faces New Disciplinary Action for Being in Wrong Dorm, Lawyer Says*, THE LENS, May 6, 2021.

**G.     Long After His Release Date, Mr. Sneed's Parole Taken**

44.     On May 7, 2021, counsel for Mr. Sneed received an email from Mr. Abbott stating, the text of which read: "The Committee on Parole has made the decision to rescind its original decision to grant Offender Sneed parole and has schedule Offender Sneed for a new parole hearing before a parole panel on Monday 5/7/21 [sic]." The email came with an attached

PDF file name "B Sneed Rescind Letter" reading as follows:

> Bobby R Sneed
> DOC# 81275
> Louisiana State Penitentiary
> Hwy. 66
> Angola LA 70712
>
>
> Dear Bobby R Sneed:
>
> This correspondence is to advise you that the Parole Board has voted to rescind the parole granted at your original parole hearing.
>
> This action was taken due to the following:
>
> We have been advised that you have admitted to drug usage after your original parole hearing.
>
>
> You will be scheduled for another hearing on 05/10/2021.
>
>
> Respectfully,
>
> Board of Parole

     45.     Immediately upon receipt of the letter, Mr. Sneed's attorney called Mr. Abbott. Mr. Abbott stated (1) that, in fact, there had not been a real Board "vote," but rather, Mr. Sneed's parole had been taken unilaterally by Committee on Parole member Tony Marabella ("I presented the paperwork and he did the action"); (2) that no other members of the Committee on Parole were notified of this action ahead of time; (3) that the information that was provided to Mr. Marabella would not be shared with Mr. Sneed; and (4) that there was no audio recording, minutes, or other record of this *ex parte* proceeding involving him and Mr. Marabella. *But see* La. Admin. Code,  La. Admin. Code Title 22, Part XI, § 111 ("There shall be no informal, off-the-record communications regarding the merits or the substance of an offender's case between committee members for the purpose of influencing a decision of the committee outside of an

official public hearing."); *accord id.* at § 501 ("All meetings and hearings of the committee shall be open to the public . . . .").

46.     Mr. Abbott further stated: "That's what happens. Mr. Sneed didn't want Steve Hoyle. That's the decision."

47.     Mr. Abbott was quoted in a local newspaper later that afternoon, "[W]e have made the decision to rescind that parole." *See* Nicholas Chrastil, *State Board Rescinds Parole for Angola Prisoner Bobby Sneed Despite Dismissal of Disciplinary Charges*, THE LENS (New Orleans, La.), May 7, 2021.

48.     Mr. Abbott also refused to disclose the secret evidence to members of the press, and was quoted in a different publication stating: "We've got documents that were submitted to the board that are not open to the public."

49.     A few minutes after the first notice, another letter was sent to Mr. Sneed concerning the "new" parole hearing he would receive, as alluded to in the earlier letter: "The Committee on Parole has scheduled your parole hearing [for 7:45AM] on 05/10/2021. . . . You or your representative may request, in writing, to continue or postpone your scheduled parole hearing for good cause. The request must be received in the Board's office no later than fourteen (14) days prior to the scheduled hearing date and must contain a specific reason(s) for the request." It was, of course, impossible to submit a request to continue or postpone the Monday morning hearing (noticed on Friday afternoon) at least 14 days prior to the hearing.

50.     Mr. Sneed sent a series of letters to the Committee on Parole and to Mr. Abbott explaining that the Committee on Parole's actions violated both state and federal law, and repeatedly requested a continuance of the hearing scheduled for Monday morning. *See* Ex. F, Ex. G., Ex. H, Ex. I. Mr. Sneed received no written rulings.

### G.    The Fix Is In: A "Hearing" Unlike Any Other in Louisiana Parole History

51.    Over the weekend, there was more negative press coverage of Louisiana corrections officials (and the parole board, in particular). Billy Binion, *Louisiana Can't Prove This 74-Year-Old Inmate Took Drugs. They Revoked His Parole Anyway*, May 7, 2021 ("It appears that Sneed might also die in prison. Not because he's still a danger to society: The board acknowledged he was no such thing in the glowing 17-minute hearing that resulted in their unanimous March decision. It will be because of a drug charge—something that is both victimless and unsubstantiated. That's not justice. That's a travesty."); Nicholas Chrastil, *State Board Rescinds Parole for Angola Prisoner Bobby Sneed Despite Dismissal of Disciplinary Charges*, May 7, 2021 ("It's cruel, illegal, and a massive waste of taxpayer money," [Mr. Sneed's lawyer] said. "But that's the Louisiana parole board at work.").

52.    On the morning of Monday, May 10, 2021, a virtual hearing occurred over Zoom.

53.    Directly (and without explanation) contradicting the written notice provided to counsel and Mr. Sneed, the private communications between Mr. Abbott and Mr. Sneed's attorney, and public statements by Mr. Abbott, Mr. Marabella orally denied in the middle of the hearing that Mr. Sneed's parole had been "rescind[ed]." Another Board member (Alvin Roche) made conflicting statements to whether Mr. Sneed's parole had already been stripped, or whether considering that question was the point of the hearing, or whether the point of the hearing was to attempt to legitimate Mr. Marabella's previously taken action. Roche explained that the hearing was occurring because "there were some circumstances after [Mr. Sneed] was granted [parole] that caused us to rescind our decision," while simultaneously concurring with Mr. Marabella that the purpose of the May 10 hearing was to decide whether to strip Mr. Sneed's parole.

54.     Throughout the event, members of the Committee on Parole made statements indicating they had already discussed Mr. Sneed's matter in off-the-record settings. Mr. Roche stated that "there were some circumstances after [Mr. Sneed] was granted [parole] that caused us to rescind our decision"; and after Mr. Sneed denied engaging in wrongdoing, Mr. Marabella confidently predicted that his colleagues' vote would "likely" be to strip Mr. Sneed of his parole based on the private information they had already received. *But see* La. Admin. Code,  La. Admin. Code Title 22, Part XI, § 111.

55.     Mr. Sneed attempted to ascertain what formal "notification" of misconduct from an authorized state official had triggered the hearing (or, rather, whether the Committee on Parole had just acted at the prompting of Mr. Abbott). Mr. Sneed again recited from the Louisiana Administrative Code that the Committee on Parole needed a "notification from the Secretary of the Department of Public Safety and Corrections" that Mr. Sneed had engaged in "misconduct" before it could act.

56.     Mr. Marabella confirmed that the Secretary had not been in contact with the Committee on Parole.

57.     Mr. Marabella stated that a "representative" of the Secretary had provided the requisite notification, but did not identify who the "representative" was (nor how, nor when, this individual contacted the Committee on Parole). Separately, Mr. Abbott told a reporter working on a story for the *Washington Post* over the weekend that the required "notification" came from LSP Deputy Warden Tracy Falgout, to whom Secretary LeBlanc had delegated authority by affidavit for purposes of triggering Committee on Parole review of previously granted parole grants.

58.     In fact, no such delegation of authority or affidavit exists. *See* Ex. H (providing examples of other affidavits delegating authority for other purposes).

59.     No "notification" to the Committee on Parole, from Secretary LeBlanc or anyone else, has been provided to Mr. Sneed.

60.     Mr. Sneed repeatedly asked for a brief continuance. He emphasized the lack of notice, and asked to review whatever "notification" the Committee on Parole had received. He reiterated his previous requests to Mr. Abbott to obtain documents, which Louisiana law requires the parole board to share pursuant to La. R.S. 15:574.12(G)(1). The Board denied the requests. Speaking on behalf of the panel, Mr. Marabella stated: "This hearing is very simple. Your motion for continuance is denied."

61.     Mr. Sneed moved for the Committee on Parole to consider the record from the three-hour administrative hearing where Mr. Sneed was cleared of wrongdoing. Mr. Marabella interrupted: "We're going forward today! . . . The record is clear. Now we're moving forward with the hearing. Does your client wish to talk?"

62.     Although previously advised that Mr. Sneed was a stroke victim who struggled to speak, the Committee on Parole denied Mr. Sneed's request to make statements and answer questions through his attorney.

63.     The Committee on Parole allowed Mr. Sneed to confer privately with counsel for two minutes—the first time Mr. Sneed had been afforded *any* opportunity to speak with an attorney about the tumultuous events since the previous Wednesday—after which Mr. Marabella immediately began examining Mr. Sneed:

Q:      You received a life sentence for the murder of Curtis James. You've been in prison for 47 years. Is that correct?
A:      Yes, sir.

Q:      Mr. Sneed, the parole board held a lengthy hearing on March 15, 2021, hearing both support and opposition [sic], and recommended [sic] parole with certain conditions. Do you recall that?

A:      Yes, sir.

Q:      Ten days later, you were found unresponsive. CPR was administered, as well as Narcon [sic]. After medical intervention, you were breathing and transported to the medical center. At which time, while at Lane Memorial Hospital, part of your admission to the Lane Memorial Hospital, as part of your history of what happened, you indicated to them that you injected heroin earlier in the day. Is that correct?

A:      No, sir.

Q:      Oh! You didn't say that?!

A:      No, sir.

Q:      You didn't inject something that you thought was heroin on that day?

A:      No, sir.

Q:      You did inject methamphetamines, didn't you?

A:      No, sir.

Q:      So you're denying what you told the medical records?

A:      I was unconscious. I didn't tell the medical records anything.

Q:      Mr. Sneed, you were transported breathing to Lane Memorial Hospital, at which time you were interviewed by the doctors and the medical staff there, and you indicated to them that you had injected heroin earlier in the day and you later tested positive for both methamphetamines and amphetamines.

A:      No, sir.

Q:      You didn't?

A:      No, sir.

Q:      That's what you're telling us today? The records indicate otherwise?

This was the entirety of the evidence adduced at the hearing.

64.      After Mr. Marabella's final question Mr. Sneed's counsel interjected: "And I have to object again. We have no idea what records the parole board is referring to. We've repeatedly asked for them, again and again, and been denied by prison authorities and by Mr. Abbott. So I'd ask, if the board would like Mr. Sneed to respond to specific allegations that we have notice of what . . ."

65.      Mr. Marabella interrupted: "I just asked him the specific questions and he has denied them." Mr. Marabella further stated: "We're not guessing! We have hard facts that we're relying on today. Now, your client has denied all of these things, and we accept that, and that's in

the record." He later explained, "We have information. This hearing is about the actions of your client on that particular day."

66.     Mr. Sneed's additional requests to call witnesses and introduce evidence were denied.

67.     Mr. Marabella said he would allow Mr. Sneed's attorney three minutes to make a closing statement. He interrupted the statement after 2 minutes and 15 seconds, stating: "Mr. Frampton, you've made your points."

68.     Mr. Sneed's attorney then informed the Committee on Parole of Mr. Abbott's plea bargain offer on May 6, 2021, urging that it was unfair to punish Mr. Sneed based on his refusal to accept a plea bargain that he never had the opportunity to accept: "I hadn't spoken yet with Mr. Sneed [on Friday, May 7 when Mr. Abbott's letter arrived]; I still haven't spoken with Mr. Sneed; this [in the midst of the hearing] is literally the first time Mr. Sneed has heard this . . . . I think this is highly improper, and I think the only reason we are here is because of this improper plea bargaining attempt. And it seems highly improper to penalize or punish Mr. Sneed based on a resolution that I was not able to communicate to him." At this point, Mr. Marabella interrupted and cut off Mr. Sneed's attorney's microphone.

69.     Mr. Marabella then addressed Mr. Sneed: "You were granted parole. 10 days later you overdosed . . . . Today my vote is going to be to deny your parole." Another member stated that "based on the information that's been provided today, for today, in preparation for today's hearing, my vote today is to deny you parole." The vote was 5-0 to "deny" parole. No member referred to "rescinding" parole during the vote, and no member provided further details on the non-public information Mr. Abbott provided them.

### H.     Post-Revocation Revelations

70.     On Tuesday, May 11, 2021, the day after the Committee on Parole hearing, DPSC finally provided Mr. Sneed's medical records from Lane Regional Medical Center that they had withheld for the past month (and that, perhaps, the Committee on Parole was referencing throughout the hearing).

71.     The records support the conclusion that Mr. Sneed collapsed due to COVID-19, pneumonia, and hypoxia, rather than the drug overdose prison officials alleged and assumed.

72.     The records reveal that, at admission, Mr. Sneed was "lethargic and unable to participate in HPI ["History of Present Illness"]. This is consistent with Mr. Sneed's consistent testimony—before both the Disciplinary Board and the Committee on Parole—that he remembers almost nothing of the events of March 25, 2021 and was not conscious during the purported interactions with medical personnel.

73.     On May 12, 2021, counsel was able to speak with Mr. Sneed's Attending Physician from Lane Regional Medical Center, Dr. Jess Anderson, identified through the belatedly disclosed medical records. She stated (1) that she remembered Mr. Sneed well, (2) that neither she nor the Nurse Practitioner who treated Mr. Sneed recalled Mr. Sneed making any admission regarding drug use during his hospital stay; (3) that it "didn't make sense" that Mr. Sneed would be the source of the purported confession given that he was "unable to participate in HPI," (4) that if LSP employees, rather than Mr. Sneed, told hospital doctors that Mr. Sneed had acknowledged drug use (perhaps passing along rumors they had heard or invented), such information could appear as it did in Mr. Sneed's Admission Notes.

74.     Mr. Sneed remains incarcerated, in fragile health, at Louisiana State Penitentiary today.

75.     According to the Louisiana Committee on Parole, Mr. Sneed will be eligible for a new "hearing" in the coming months.

## COUNT I

### 42 U.S.C § 1983 – Procedural Due Process Claim

76.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

77.     Mr. Sneed's parole was revoked by a Single Member Action on May 7, 2021 (as indicated in formal correspondence from the Committee on Parole and in Executive Director Francis Abbott's statements to counsel and the press), somehow reinstated, and then revoked again after the peculiar "clean-up" proceeding the following Monday, on May 10, 2021.

78.     Whether viewed as two separate revocations, or one protracted revocation proceeding, the procedure violated the Fourteenth Amendment's Due Process Clause.

79.     Under Louisiana law, the Committee on Parole may "grant," "deny," "modify," and "revoke" parole; the Committee on Parole lacks legal authority to withdraw a previously granted parole by "rescind[ing]" it. *See* La. R.S. 15:574.2—15:574.13. In this regard, the Committee on Parole's decision to "grant" parole is identical to a Louisiana trial court's ruling on certain motions. *Cf. State v. Bullock*, 269 So. 2d 824, 825 (La. 1972) (explaining trial court "was without authority to rescind . . . [its] order[, which] was no longer subject to revision or reversal by the trial court which had rendered it."). Title 15, in which the Legislature established the legal framework for the Committee on Parole, makes no mention of an authority to "rescind" parole, nor has any Louisiana court ever held that the Committee on Parole has the power to "rescind" a previously granted parole (particularly not after a fixed release date). In sum, once a prisoner is granted parole, and certainly after a fixed release date, Louisiana law provides that

this individual remains paroled until such status is lawfully "revoked." *See* La. R.S. 15:574.9 (governing revocations).

80.     Mr. Sneed's parole was granted on March 15, 2021 and his release date was fixed for March 26, 2021.

81.     On either the morning of Friday, May 7, 2021 or on the morning of Monday, May 10, 2021, at least five weeks after Mr. Sneed's release date, Mr. Sneed's parole was revoked.

82.     Mr. Sneed was denied "due process of law" when his parole was stripped:

      a.     He was not given written notice of the claimed violations of parole.

      b.     The evidence against him was not disclosed.

      c.     He did not receive a meaningful opportunity to be heard, to present witnesses, and to present documentary evidence.

      d.     He did not have the right to confront and cross-examine adverse witnesses.

      e.     The hearing body was neither "neutral" nor "detached"

      f.     He did not receive a written statement by factfinders as to the evidence relied on and reasons for revoking parole.

83.     The Committee on Parole's disregard for state law strengthens Mr. Sneed's federal due process claim. *See, e.g.,* La. R.S. 15:574.7(C)(2)(a)(i) (providing that parole officials may not ordinarily impose incarceration, let alone revoke parole outright, in response to a parolee's first positive drug test).

84.     The net effect was to deprive Mr. Sneed of a liberty and property interest without the "due process of law" guaranteed by the Fourteenth Amendment.

**COUNT II**

**42 U.S.C § 1983 – First Amendment Claim**

85.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

86.     Even assuming the stripping of Mr. Sneed's parole complied with the minimal requirements of procedural due process and state law, the actions of the Committee on Parole and Mr. Abbott (who waited many weeks after the alleged wrongdoing by Mr. Sneed before acting to strip Mr. Sneed of his parole) offended the First Amendment.

87.      Mr. Sneed engaged in constitutionally protected activity when he made the difficult strategic decision to publicize his Disciplinary Board proceedings—a story that quickly went "viral" nationally and cast Louisiana corrections officials in a negative light; when he challenged the credibility of Louisiana correctional officers at an administrative hearing; and when he vigorously (and successfully) availed himself of the procedural rights in opposing his disciplinary charges before the LSP administrative hearing process.

88.     Conspicuously, Mr. Abbott and the Committee on Parole took no adverse action against Mr. Sneed at any point between March 25, 2021 and May 6, 2021; only after Mr. Sneed engaged in protected First Amendment activity critical of Louisiana corrections officials did the Committee on Parole act.

89.     On the evening of May 6, 2021, Mr. Abbott referred derisively to the ongoing press coverage of Mr. Sneed's case and stated it would not help Mr. Sneed before the Committee on Parole. He asked to be notified if the *Wall Street Journal* was planning on covering the matter.

90.     On the morning of May 7, 2021, Mr. Abbott presented information to Mr. Marabella and stripped Mr. Sneed of his parole. Undertaking discretionary acts that resulted in stripping a person of their parole, after nearly 47 years in prison, caused Mr. Sneed to suffer an

injury that would chill a person of ordinary firmness from continuing to engage in the protected activity. *Cf. Nyberg v. Davidson*, 776 F. App'x 578, 582 (11th Cir. 2019) ("denying [prisoner] parole no doubt constitutes an adverse action that would deter an inmate of ordinary firmness from engaging in First Amendment protected conduct [like accessing courts]"); *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012) (reversing dismissal of prisoner's First Amendment retaliation claim based on allegations that two corrections officers lied at the inmate's parole hearing in retaliation for filing grievances, which caused the inmate to be denied parole); *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

91.     The defendants' adverse actions beginning on May 7, 2021, and continuing until May 10, 2021, were substantially motivated against Mr. Sneed's exercise of constitutionally protected conduct. They were also a but-for cause of the actions: if Mr. Sneed's alleged drug use were an independently sufficient basis for acting to strip his parole, Mr. Abbott and the Committee on Parole would have acted at some point in the preceding 43 days, not only *after* Mr. Sneed was cleared of wrongdoing.

## COUNT III

## 42 U.S.C § 1983 – "Vindictiveness" Claim

92.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

93.     The basic principle that criminal legal system actors may not retaliate against individuals for their exercise of a statutory or constitutional right has been extended from sentencing judges (*North Carolina v. Pearce*, 395 U.S. 711 (1969)) to prosecutors (*Blackledge v. Perry*, 417 U.S. 21 (1974)) to parole boards. *See, e.g, Kindred v. Spears*, 894 F.2d 1477 (5th Cir.

1990), *Bono v. Benov*, 197 F.3d 409 (9th Cir. 1999), *Marshall v. Lansing*, 839 F.2d 933 (3d Cir. 1988).

94.     Mr. Sneed exercised his statutory and constitutional rights: he vigorously (and successfully) asserted his rights before the LSP Disciplinary Board; he rejected an improper attempt to "plea bargain" around the Committee on Parole process on May 6, 2021; he attempted to bring these concerns to the attention of the Committee on Parole; and he protested the lawlessness of the Committee on Parole's May 7, 2021 *ex parte* "rescind[ing]" of his parole through formal motions and vigorous objections at the May 10, 2021 proceeding.

95.     In response, the Committee on Parole took the unusually harsh action of stripping Mr. Sneed of his parole entirely (and refused to even entertain the lesser alternative course that Mr. Abbott floated like sending Mr. Sneed to a nine-month drug treatment program in DOC custody).

96.     As with Mr. Sneed's First Amendment claim, the Committee on Parole's decision to wait until *after* Mr. Sneed (successfully) availed himself of his procedural rights defies benign explanation.

97.     Strengthening the inference of improper motivation, Louisiana law provides that the appropriate response for a "first positive drug test" is not the harsh penalty imposed by the Committee on Parole. *See* La. R.S. 15:574.7(C)(2)(a)(i) (providing that parole officials may *not* ordinarily order even a brief period of incarceration, let alone revoke parole outright, in response to a parolee's first positive drug test).

98.     There is a "reasonable likelihood" that the Committee on Parole's unusual (indeed unprecedented) treatment of Mr. Sneed's case is the product of actual vindictiveness in response to his exercise of his rights. *Bono*, 197 F.3d at 416.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that this Court enter judgment in his favor and against

Defendants, awarding declaratory and injunctive relief, preliminary injunctive relief, and costs

and attorney's fees against all Defendants, and for such further and additional relief as this Court

may deem appropriate and just. He seeks declaratory and injunctive relief both with respect to

Defendants' unlawful acts of May 7/May 10 and future unconstitutional conduct at the hearing

state officials intend to hold in the coming months.

Respectfully submitted,

**BOBBY SNEED**

By: /s/ Thomas W. Frampton
His attorney

Thomas W. Frampton
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903
(202) 352-8341
*Affiliation for Identification Only*