# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**BOBBY SNEED**

**CIVIL ACTION**

**VERSUS**

**NO. 21-279-JWD-RLB**

**FRANCIS ABBOTT, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(6)* ("*MTD II*") (Doc. 16) filed by Defendants, the Louisiana Committee on Parole (the "Committee") Executive Director Francis Abbott and Committee members Tony Marabella, Sheryl Ranatza, Jim Wise, Pearl Wise, and Alvin Rouche, Jr. (the "Committee Members") (Abbott and the Committee Members are, collectively, "Defendants"). Plaintiff Bobby Sneed opposes the motion. (Doc. 18.) Defendants have filed a reply. (Doc. 20.) Oral argument is not necessary. The Court has carefully considered the law, the facts alleged in the *First Amended Complaint* ("*FAC*") (Doc. 12) and its attachments, and the arguments and submissions of the parties and is prepared to rule.

Preliminarily, the Court notes that, if true, the allegations of the *FAC* are extremely troubling. The *FAC* portrays Defendants as petty tyrants who are accountable to no one and who exercise their power without regard to the wellbeing of those within their jurisdiction. If true, Defendants' flagrant disregard of procedural norms in the two hearings at issue is, at best, irregular, and, at worst, reprehensible.

But, however terrible the Court finds Defendants' alleged conduct to be, it is bound to apply controlling precedent. That authority—*Heck v. Humphrey*, 512 U.S. 477 (1994) and its progeny—provides that, when a plaintiff makes an attack on the propriety of a single defective

parole hearing (or, in this case, two hearings) and seeks an earlier release from custody, then such claims cannot be asserted until state habeas corpus remedies are exhausted.

Having carefully considered the matter, the Court finds that Plaintiff's claims are barred by *Heck*.  While the *Heck* line has an exception for attacks on general parole procedures, the allegations of the *FAC* do not fall into this category.  Consequently, Defendant's motion will be granted.

However, because it is possible that Plaintiff could make an attack on general parole procedures, he will be given an opportunity to amend the operative complaint to state viable claims.  If Plaintiff instead chooses to pursue state habeas relief, then judgment will be entered in this action, and his claims will be dismissed without prejudice.

## I.    Relevant Factual and Procedural Background

### A.  Introduction

The following allegations are taken from the *FAC* and its attachments. *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross and Blue Shield of Georgia, Inc*., 892 F.3d 719, 726 (5th Cir. 2018).  They are assumed to be true for purposes of this motion and construed in a light most favorable to Plaintiff.  *See Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

Plaintiff is a 74-year-old man named Bobby Sneed. (*FAC*, Doc. 12 at 1.)  Plaintiff spent nearly 47 years at Louisiana State Penitentiary ("LSP"). (*Id.*)

On March 15, 2021, Plaintiff unanimously won his parole. (*Id.*)  "Prison authorities moved slowly in processing his release." (*Id.*)  Plaintiff alleges that the Department of Corrections continued to hold him at LSP even after the parole board vote and after his residential plan was approved; "absolutely nothing (except bureaucratic delay from LSP officials) prevented Mr. Sneed's immediate release." (*Id.* ¶ 16.)

"[E]ach day that passed, Mr. Sneed's health grew worse. Already having suffered a stroke in LSP custody in years past, Mr. Sneed developed COVID-19, pneumonia, sepsis, and hypoxia." (*Id.* at 1.)

His release date was set for March 26, 2021, but, less than 24 hours before that day, Plaintiff collapsed and was rushed to a nearby hospital. (*Id.*)  He was returned to LSP four days later and placed in "Administrative Segregation." (*Id.*) "Based on a urine sample that may (or may not) have been extracted from an unconscious Mr. Sneed, prison officials alleged that Mr. Sneed possessed contraband (i.e., drugs) that caused his collapse." (*Id.* at 1–2; *see also id.* ¶¶ 19–22.) "Mr. Sneed's release date came and went, with no action from LSP." (*Id.*)

**B.  The LSP Disciplinary Proceeding**

According to Plaintiff, "[he] spent over a month in a portion of LSP known as 'the Dungeon,' without his artificial teeth or shoes, before getting his administrative hearing." (*FAC*, Doc. 12 at 2.) "After a three-hour Disciplinary Board hearing on Wednesday, May 6, 2021, a panel of prison officials cleared Mr. Sneed of all wrongdoing related to his March 25, 2021 medical emergency." (*Id.*; *see also id.* ¶¶ 16–22, 29–33.)

The *FAC* elaborates on the questionable aspects of the Disciplinary Board proceeding. Specifically, the Disciplinary Board initially denied all of Plaintiff's motions raising procedural objections, such as the failure to promptly adjudicate the Board's allegations and the failure to provide proper notice, and those motions seeking to confront his accuser, call witnesses, and conduct a further investigation (including to review his medical records). (*Id.* ¶ 29.)  The *FAC* explains:

> The Disciplinary Board then read into the record the chief evidence against Mr. Sneed: a presumptive positive test from a "ToxCup" urine test for amphetamine and methamphetamine from March 25, 2021, and a subsequent laboratory test of that sample suggesting the

> additional presence of opiates. Mr. Sneed was then given the
> opportunity to present evidence. He introduced evidence indicating
> LSP officials (1) fraudulently altered their "ToxCup" forms in Mr.
> Sneed's case; (2) mishandled the urine samples before they were
> sent to an outside laboratory; and (3) had no idea how, when, or if
> the purported urine sample was obtained from an unconscious Mr.
> Sneed. Mr. Sneed testified that he had almost no memories from
> March 25, 2021 because he was unconscious for most of the day.

(*Id.* ¶ 30.)  Plaintiff's medical records were withheld, so he "had no opportunity to argue that other

medications he was prescribed were responsible for generating any false positive results, if in fact

that urine was obtained from him." (*Id.* ¶ 31.)  The *FAC* continues:

> For instance, prison officials concealed (until May 11, 2021) that
> they injected Mr. Sneed with morphine before taking him to an
> outside hospital, which explains any opiates in his urine; many other
> drugs commonly administered to treat diabetes, high blood pressure,
> sinus and nasal congestion, and pneumonia can result in false
> positive tests for amphetamine and methamphetamine.

(*Id.*)

Additionally, though Plaintiff was found not guilty, he was faced with another "baseless

charge" ("being impermissibly present in the dormitory where Mr. Sneed collapsed on March 25,

2021"), but LSP officials withdrew this charge the following day "when they were forced to

acknowledge Mr. Sneed was authorized to be there." (*Id.* ¶ 33.)  Thus, "Mr. Sneed was once again

due to return home to spend his final years with his siblings, children, and grandchildren." (*Id.* at

2.)

### C.  Abbott's Threats and Plea Bargaining

According to the *FAC*, Abbott knew about the allegations against Plaintiff since at least

March 31, 2021. (*FAC* ¶ 34, Doc. 12.)

On the evening of May 6, 2021, Plaintiff's counsel asked Abbott about Plaintiff's release,

and, later that evening, Abbott called the attorney and said that he "had the authority to revoke Mr.

Sneed's parole despite the Disciplinary Board" and that he did not need to give Plaintiff formal "notification" of misconduct. (*Id.* ¶¶ 34-37.) Abbott proposed that Sneed go to a nine-month drug treatment program with the Department of Corrections while the Committee would "keep the matter open." (*Id*. ¶ 38.) Sneed "might re-earn his parole." (*Id.*)

Plaintiff's counsel responded to these proposals, including by stating that he did not think Abbott "had the authority to engage in such negotiations on behalf of the Committee." (*Id.* ¶ 39.) Plaintiff's attorney said that the ultimate decision would be Plaintiff's. (*Id.*) "No agreement was reached, and counsel had no opportunity to communicate Mr. Abbott's proposal to Mr. Sneed before the next day's events." (*Id.* ¶ 41.)

Additionally, during this call, "Abbott referred derisively to the ongoing press coverage of Mr. Sneed's case and stated it would not help Mr. Sneed before the Committee on Parole." (*Id.* ¶ 40.) Abbott also asked if the *Wall Street Journal* would cover the matter. (*Id.*) Plaintiff claims that Abbott knew of the "negative press coverage, and critical statements by Mr. Sneed's counsel about Louisiana corrections officials, beginning at the latest May 6, 2021." (*Id.* ¶ 42.) According to the *FAC*, news coverage about Plaintiff's situation "was generating substantial negative publicity about Louisiana corrections officials," including over 150,000 "views" on Reason.com and a thirty-minute segment on a New York City radio station. (*Id.*) "[O]nline reaction to Louisiana corrections officials' actions was overwhelmingly hostile." (*Id.*) "On behalf of Mr. Sneed, his attorney made critical statements about Louisiana corrections officials, and was encouraging others to petition Secretary LeBlanc." (*Id.* (citing, *e.g.*, Billy Binion, *He Was Granted Parole After Servicing 47 Years Behind Bars. Now the Prison Won't Let Him Leave.* REASON, MAY 6, 2021 MAY 6, 2021 ("It feels like we've gone from tragedy to farce.").) "One of Mr. Sneed's family members agreed to talk with journalists, but only if their name and gender was masked." (*Id.* ¶ 43

(citing Nicholas Chrastil, *Angola Prison Who Faced Loss of Parole Cleared on Contraband Charges, but Now Faces New Disciplinary Action for Being in Wrong Dorm, Lawyer Says*, THE LENS, May 6, 2021).)  Plaintiff alleges that these news articles "portrayed Louisiana corrections officials in a  harsh light for their handling of Mr. Sneed's release." (*Id.* at 2.)

### D.  Parole "Rescinded" or Revoked

#### 1. The May 7, 2021, "Hearing"

On May 7, 2021, Abbott emailed Plaintiff's attorney the following: "The Committee on Parole has made the decision to rescind its original decision to grant Offender Sneed parole and has scheduled Offender Sneed for a new parole hearing before a parole panel on Monday 5/7/21 [sic]." (*FAC* ¶ 44, Doc. 12.)  A PDF letter was attached to the email with a file name "B Sneed Rescind Letter" which read:

> Bobby R Sneed
> DOC# 81275
> Louisiana State Penitentiary
> Hwy. 66
> Angola LA  70712
>
> Dear Bobby R Sneed:
>
> This correspondence is to advise you that the Parole Board has voted to rescind the parole granted at your original parole hearing.
>
> This action was taken due to the following:
>
> We have been advised that you have admitted to drug usage after your original parole hearing.
>
> You will be scheduled for another hearing on 05/10/2021.
>
>
> Respectfully,
>
> Board of Parole

(*Id.*)

Plaintiff's counsel promptly called Abbott. (*Id.*)  Abbott said:

> (1) that, in fact, there had not been a real Board "vote," but rather, Mr. Sneed's parole had been taken unilaterally by Committee on

> Parole member Tony Marabella ("I presented the paperwork and he did the action"); (2) that no other members of the Committee on Parole were notified of this action ahead of time; (3) that the information that was provided to Mr. Marabella would not be shared with Mr. Sneed; and (4) that there was no audio recording, minutes, or other record of this *ex parte* proceeding involving him and Mr. Marabella. *But see* La. Admin. Code, La. Admin. Code Title 22, Part XI, § 111 ("There shall be no informal, off-the-record communications regarding the merits or the substance of an offender's case between committee members for the purpose of influencing a decision of the committee outside of an official public hearing."); *accord id.* at § 501 ("All meetings and hearings of the committee shall be open to the public . . . .").

(*Id.* ¶ 45.)  Abbott told the lawyer, "That's what happens. Mr. Sneed didn't want Steve Hoyle. That's the decision." (*Id.* ¶ 46.)

That afternoon, a local newspaper quoted Abbott as saying, "[W]e have made the decision to rescind that parole." (*Id.* ¶ 47 (citation omitted).)   "Mr. Abbott also refused to disclose the secret evidence to members of the press, and was quoted in a different publication stating: 'We've got documents that were submitted to the board that are not open to the public.' " (*Id.* ¶ 48.)

A few minutes after the above notice, Plaintiff was sent a second letter regarding a "new" parole hearing he would have that was referenced in the earlier letter. (*Id.* ¶ 49.)  The letter said:

> "The Committee on Parole has scheduled your parole hearing [for 7:45AM] on 05/10/2021. . . . You or your representative may request, in writing, to continue or postpone your scheduled parole hearing for good cause. The request must be received in the Board's office no later than fourteen (14) days prior to the scheduled hearing date and must contain a specific reason(s) for the request."

(*Id.*)

The *FAC* noted that submitting a request to postpone the hearing at least fourteen days before it was "impossible." (*Id.*)  Sneed sent a number of letters to the Committee and Abbott claiming that their actions violated state and federal law, and Plaintiff requested a continuance of the hearing. (*Id.* ¶ 50.)

7

### 2. The May 10, 2021, "Hearing"

The next section of the *FAC* is entitled, "The Fix Is In: A 'Hearing' Unlike Any Other in Louisiana Parole History." (*FAC*, Doc. 12 at 16.)  It begins by quoting some of the negative press coverage Louisiana corrections officials and the Board received. (*Id.* ¶ 51.)

The Monday, May 10, 2021, hearing was held virtually by Zoom. (*Id.* ¶ 52.)   Contrary to all of the above communications—the May 7, 2021, letter, the private exchanges between Abbott and Plaintiff's lawyer, and Abbott's public statements—"Marabella orally denied in the middle of the hearing that Mr. Sneed's parole had been 'rescinded.' " (*Id.* ¶ 53.)  Further, another Board member (Alvin Roche) made contradictory and conflicting statements concerning whether Plaintiff's parole had been stripped, whether that question was the point of the hearing, or whether the hearing was intended to "attempt to legitimate Mr. Marabella's previously taken action." (*Id.* ¶ 53.)

Further, "[t]hroughout the event, members of the Committee . . . made statements indicating they had already discussed Mr. Sneed's matter in off-the-record settings." (*Id.* ¶ 54.) Roche said, "there were some circumstances after [Mr. Sneed] was granted [parole] that caused us to rescind our decision," and, following Plaintiff's denial, "Mr. Marabella confidently predicted that his colleagues' vote would 'likely' be to strip Mr. Sneed of his parole based on the private information they had already received." (*Id.*)

Plaintiff also tried to determine whether a formal "notification" of misconduct from a state official had caused the hearing or whether the Committee had done so at Abbott's prompting. (*Id.* ¶ 55.)  Plaintiff again recited the Louisiana Administrative Code that the Committee required " 'notification from the Secretary of the Department. . .' that Mr. Sneed had engaged in 'misconduct' before it could act." (*Id.*)

8

"Mr. Marabella confirmed that the Secretary had not been in contact with the Committee[.]" (*Id.* ¶ 56.)  Rather, according to Marabella, a "representative" of the Secretary had given the required notification. (*Id.* ¶ 57.)  Marabella did not identify who the "representative" was or how and when this person contacted the Committee.  (*Id.*)  Plaintiff alleges:

> Separately, Mr. Abbott told a reporter working on a story for the Washington Post over the weekend that the required "notification" came from LSP Deputy Warden Tracy Falgout, to whom Secretary LeBlanc had delegated authority by affidavit for purposes of triggering Committee on Parole review of previously granted parole grants.  In fact, no such delegation of authority or affidavit exists. . . . No "notification" to the Committee on Parole, from Secretary LeBlanc or anyone else, has been provided to Mr. Sneed.

(*Id.* ¶¶ 57–59.)

Plaintiff also alleges that he "repeatedly asked for a brief continuance" because of the lack of notice, the need to review the "notification" the Committee had received, and the desire to obtain documents which the parole board must share under Louisiana law. (*Id.* ¶ 60.)  The Committee denied his request, saying in part, "This hearing is very simple." (*Id.*)

Plaintiff also moved the Committee to consider the record from his three-hour administrative hearing which cleared him of wrongdoing. (*Id.* at 61.)  "Mr. Marabella interrupted: 'We're going forward today! . . . The record is clear. Now we're moving forward with the hearing. Does your client wish to talk?' " (*Id.*)

The Committee had been advised that Plaintiff had suffered a stroke and had trouble speaking, but the Committee denied Plaintiff's request to allow his attorney to make statements and answer questions on his behalf. (*Id.* ¶ 62.)  The Committee let Plaintiff confer privately with his attorney for two minutes (which was the first time Plaintiff had been given any opportunity to speak with his attorney about the events of the previous Wednesday). (*Id.* ¶ 63.)  Marabella then

"immediately began examining" Plaintiff, which was the "entirety of the evidence adduced at the

hearing":

> Q: You received a life sentence for the murder of Curtis James. You've been in prison for 47 years. Is that correct?
>
> A: Yes, sir.
>
> Q: Mr. Sneed, the parole board held a lengthy hearing on March 15, 2021, hearing both support and opposition [sic], and recommended [sic] parole with certain conditions. Do you recall that?
>
> A: Yes, sir.
>
> Q: Ten days later, you were found unresponsive. CPR was administered, as well as Narcon [sic]. After medical intervention, you were breathing and transported to the medical center. At which time, while at Lane Memorial Hospital, part of your admission to the Lane Memorial Hospital, as part of your history of what happened, you indicated to them that you injected heroin earlier in the day. Is that correct?
>
> A: No, sir.
>
> Q: Oh! You didn't say that?!
>
> A: No, sir.
>
> Q: You didn't inject something that you thought was heroin on that day?
>
> A: No, sir.
>
> Q: You did inject methamphetamines, didn't you?
>
> A: No, sir.
>
> Q: So you're denying what you told the medical records?
>
> A: I was unconscious. I didn't tell the medical records anything.
>
> Q: Mr. Sneed, you were transported breathing to Lane Memorial Hospital, at which time you were interviewed by the doctors and the medical staff there, and you indicated to them that you had injected

heroin earlier in the day and you later tested positive for both methamphetamines and amphetamines.

A: No, sir.

Q: You didn't?

A: No, sir.

Q: That's what you're telling us today? The records indicate otherwise?

(*Id.*) The *FAC* continues:

After Mr. Marabella's final question Mr. Sneed's counsel interjected: "And I have to object again. We have no idea what records the parole board is referring to. We've repeatedly asked for them, again and again, and been denied by prison authorities and by Mr. Abbott. So I'd ask, if the board would like Mr. Sneed to respond to specific allegations that we have notice of what . . ."

[] Mr. Marabella interrupted: "I just asked him the specific questions and he has denied them." Mr. Marabella further stated: "We're not guessing! We have hard facts that we're relying on today. Now, your client has denied all of these things, and we accept that, and that's in the record." He later explained, "We have information. This hearing is about the actions of your client on that particular day."

(*Id.* ¶¶ 64–65.)

Plaintiff was denied additional requests to call witnesses and introduce evidence. (*Id.* ¶ 66.) Marabella stated he would give Plaintiff's counsel three minutes to make a closing statement, but, after 2 minutes and 15 seconds, Marabella interrupted and said, "Mr. Frampton, you've made your points." (*Id.* ¶ 67.)

Plaintiff's counsel then told the Committee of Abbott's May 6, 2011, plea offer and urged that it was unfair to punish Plaintiff because he refused to accept a plea bargain he never had an opportunity to accept. (*Id.* ¶ 68.) Plaintiff's counsel said:

I hadn't spoken yet with Mr. Sneed [on Friday, May 7 when Mr. Abbott's letter arrived]; I still haven't spoken with Mr. Sneed; this

11

> [in the midst of the hearing] is literally the first time Mr. Sneed has
> heard this . . . . I think this is highly improper, and I think the only
> reason we are here is because of this improper plea bargaining
> attempt. And it seems highly improper to penalize or punish Mr.
> Sneed based on a resolution that I was not able to communicate to
> him."

(*Id.*)  Marabella then interrupted Plaintiff's attorney and cut off his microphone. (*Id.*)  The *FAC*

then asserts:

> Mr. Marabella then addressed Mr. Sneed: "You were granted parole.
> 10 days later you overdosed . . . . Today my vote is going to be to
> deny your parole." Another member stated that "based on the
> information that's been provided today, for today, in preparation for
> today's hearing, my vote today is to deny you parole." The vote was
> 5-0 to "deny" parole. No member referred to "rescinding" parole
> during the vote, and no member provided further details on the non-
> public information Mr. Abbott provided them.

(*Id.* ¶ 69.)

### E.  Post-Hearing Discoveries

The following day, Tuesday, May 11, 2021, the Department of Corrections provided

Plaintiff's medical records from Lane Regional Medical Center, which had purportedly been

"withheld for the past month (and that, perhaps, the Committee . . . was referencing throughout

the hearing)." (*FAC* ¶ 70, Doc. 12.)  "The records support the conclusion that Mr. Sneed collapsed

due to COVID-19, pneumonia, and hypoxia, rather than the drug overdose prison officials alleged

and assumed." (*Id.* ¶ 71.)  Further, the records show that, when Plaintiff was admitted, he was

"lethargic and unable to participate in HPI ['History of Present Illness']," which was consistent

with his "consistent testimony" before the Disciplinary Board and Committee that he did not

remember anything of the March 25, 2021, and was unconscious during his interactions with

medical personnel. (*Id.* ¶ 72.)

On the next day, May 12, 2021, Plaintiff's counsel spoke with Plaintiff's Attending Physician at Lane Regional Medical Center, Dr. Jess Anderson. (*Id.* ¶ 73.)  Anderson was identified through the "belatedly disclosed medical records." (*Id.*)  Anderson said:

> (1) that she remembered Mr. Sneed well[;] (2) that neither she nor the Nurse Practitioner who treated Mr. Sneed recalled Mr. Sneed making any admission regarding drug use during his hospital stay; (3) that it "didn't make sense" that Mr. Sneed would be the source of the purported confession given that he was "unable to participate in HPI[;]" [and] (4) that if LSP employees, rather than Mr. Sneed, told hospital doctors that Mr. Sneed had acknowledged drug use (perhaps passing along rumors they had heard or invented), such information could appear as it did in Mr. Sneed's Admission Notes.

(*Id.*)

"Mr. Sneed remains incarcerated, in fragile health, at Louisiana State Penitentiary today." (*Id.* ¶ 74.)  "According to the . . . Committee . . . , Mr. Sneed will be eligible for a new 'hearing' in the coming months." (*Id.* ¶ 75.)

### F.  Plaintiff's Claims

Plaintiff asserts the following claims: (1) a violation of his right to procedural due process, (2) retaliation in violation of the First Amendment, and (3) "vindictiveness." (*FAC* ¶¶ 76–98, Doc. 12.)

### 1. Due Process

As to the first, Plaintiff alleges,

> Mr. Sneed's parole was revoked by a Single Member Action on May 7, 2021 (as indicated in formal correspondence from the Committee on Parole and in Executive Director Francis Abbott's statements to counsel and the press), somehow reinstated, and then revoked again after the peculiar "clean-up" proceeding the following Monday, on May 10, 2021. . . . Whether viewed as two separate revocations, or one protracted revocation proceeding, the procedure violated the Fourteenth Amendment's Due Process Clause

(*Id.* ¶¶ 77–78.)

Plaintiff asserts that the Committee "lacks legal authority to withdraw a previously granted parole by 'rescind[ing]' it." (*Id.* ¶ 79.)  Title 15 of the Louisiana Revised Statutes, which sets forth the "legal framework for the Committee . . ., makes no mention of an authority to 'rescind' parole, nor has any Louisiana court ever held that the Committee . . . has the power to 'rescind' a previously granted parole (particularly not after a fixed release date)." (*Id.*)  "In sum, once a prisoner is granted parole, and certainly after a fixed release date, Louisiana law provides that this individual remains paroled until such status is lawfully 'revoked.' " (*Id.*(citing La. Rev. Stat. Ann. § 15:574.9).)

Here, Plaintiff was granted parole on March 15, 2015, and was given a fixed release date of March 26, 2021. (*Id.* ¶ 80.)  But, on either Friday, May 7, 2021, or Monday, May 10, 2021 (which was at least five weeks following the release date), Plaintiff's parole was revoked. (*Id.*) Plaintiff pleads:

> Mr. Sneed was denied "due process of law" when his parole was stripped:
>
> a. He was not given written notice of the claimed violations of parole.
>
> b. The evidence against him was not disclosed.
>
> c. He did not receive a meaningful opportunity to be heard, to present witnesses, and to present documentary evidence.
>
> d. He did not have the right to confront and cross-examine adverse witnesses.
>
> e. The hearing body was neither "neutral" nor "detached"[.]
>
> f. He did not receive a written statement by factfinders as to the evidence relied on and reasons for revoking parole.

(*Id.* ¶ 82.)  The Committee also disregarded state law by revoking parole in response to a first positive drug test. (*See id.* ¶ 83.)  Plaintiff concludes, "The net effect was to deprive Mr. Sneed of

a liberty and property interest without the 'due process of law' guaranteed by the Fourteenth

Amendment." (*Id.* ¶ 84.)

## 2. First Amendment Retaliation

As to Plaintiff's second claim, he asserts:

> Mr. Sneed engaged in constitutionally protected activity when he made the difficult strategic decision to publicize his Disciplinary Board proceedings—a story that quickly went "viral" nationally and cast Louisiana corrections officials in a negative light; when he challenged the credibility of Louisiana correctional officers at an administrative hearing; and when he vigorously (and successfully) availed himself of the procedural rights in opposing his disciplinary charges before the LSP administrative hearing process.
>
> [] Conspicuously, Mr. Abbott and the Committee on Parole took no adverse action against Mr. Sneed at any point between March 25, 2021 and May 6, 2021; only after Mr. Sneed engaged in protected First Amendment activity critical of Louisiana corrections officials did the Committee on Parole act.

(*FAC* ¶¶ 87–88, Doc. 12.)  Plaintiff again refers to the conversation between his attorney and

Abbott on May 6, 2021, in which Abbott "referred derisively to the ongoing press coverage of Mr.

Sneed's case and stated it would not help [him] before the Committee" and "asked to be notified

if the *Wall Street Journal* was planning on covering the matter." (*Id.* ¶ 89.)

Plaintiff then claims:

> On the morning of May 7, 2021, Mr. Abbott presented information to Mr. Marabella and stripped Mr. Sneed of his parole. Undertaking discretionary acts that resulted in stripping a person of their parole, after nearly 47 years in prison, caused Mr. Sneed to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity. [(case citations omitted)].

(*Id.* ¶ 90.)

Plaintiff lastly pleads that Defendants' "adverse actions beginning on May 7, 2021, and continuing until May 10, 2021, were substantially motivated against Mr. Sneed's exercise of constitutionally protected conduct." (*Id.* ¶ 91.)  Further:

> They were also a but-for cause of the actions: if Mr. Sneed's alleged drug use were an independently sufficient basis for acting to strip his parole, Mr. Abbott and the Committee on Parole would have acted at some point in the preceding 43 days, not only *after* Mr. Sneed was cleared of wrongdoing.

(*Id.* ¶ 91.)

### 3. Vindictiveness

"The basic principle that criminal legal system actors may not retaliate against individuals for their exercise of a statutory or constitutional right has been extended . . . to parole boards." (*FAC* ¶ 93, Doc. 12 (citations omitted).)  Plaintiff claims that he exercised his constitutional and statutory rights before the Disciplinary Board, by rejecting Abbott's "plea bargain," by raising his concerns before the Committee, by protesting the Committee's May 8, 2021, *ex parte* "rescind[ing]" of his parole through various motions and objections at the May 10, 2021, hearing. (*Id.* ¶ 94.)  "In response, the Committee . . . took the unusually harsh action of stripping Mr. Sneed of his parole entirely (and refused to even entertain the lesser alternative course that Mr. Abbott floated like sending Mr. Sneed to a nine-month drug treatment program in DOC custody)." (*Id.* ¶ 95.)

Plaintiff claims, "As with Mr. Sneed's First Amendment claim, the Committee['s] . . . decision to wait until *after* Mr. Sneed (successfully) availed himself of his procedural rights defies benign explanation." (*Id.* ¶ 96.)  Plaintiff again cites the fact that, by statute, parole officials may generally not revoke parole in response to a parolee's first drug test. (*Id.* ¶ 97.)  Plaintiff alleges, "There is a 'reasonable likelihood' that the Committee on Parole's unusual (indeed unprecedented)

treatment of Mr. Sneed's case is the product of actual vindictiveness in response to his exercise of his rights." (*Id.* ¶ 98 (citation omitted).)

### *4. Prayer*

Plaintiff prays for declaratory and injunctive relief as well as costs and attorney's fees. (*FAC*, Doc. 12 at 27.)  Plaintiff specifically "seeks declaratory and injunctive relief both with respect to Defendants' unlawful acts of May 7/May 10 and future unconstitutional conduct at the hearing state officials intend to hold in the coming months." (*Id.*)

### G.  The Instant Motion

Defendants now file the instant *MTD II*. (Doc. 16.)  Defendants urge (1) that all of Plaintiff's claims are barred by the *Heck* doctrine; (2) "Plaintiff has no 'constitutionally protected liberty interest' as to the Committee's discretionary decisions to grant or rescind parole"; and (3) for a number of reasons, Plaintiff has no retaliation or vindictiveness claim. (*MTD II*, Doc. 16 ¶¶ 2–5.)

Here, the Court finds that the motion turns on the first issue, so the Court's discussion will be primarily focused on that.  However, since the Court is granting leave to amend, the Court will provide some guidance on the other issues.

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);] *Twombly*, 55[0] U.S. at 556[.] . . . This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. Rule Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257, *Twombly*, 55[0] U.S. at 556[.]

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### III.    Discussion

#### A.  Parties' Arguments

##### *1. Defendants' Original Motion (Doc. 16) and Memorandum (Doc. 16-1)*

Defendants first argue that Plaintiff's claims are barred by the *Heck* doctrine because he seeks immediate release from incarceration. (*MTD II*, Doc. 16 ¶ 2.)  Defendants maintain that, under *Heck*, a prisoner has no cognizable § 1983 claim where a judgment in Plaintiff's favor would imply the invalidity of his conviction or sentence, and that, before the Court can entertain such a claim, the "individual must show that his conviction or sentence has been overturned or called into question in a separate proceeding, such as a habeas corpus proceeding." (Doc. 16-1 at 5 (citations omitted).)  Defendants then cite to a line of cases supporting their position as well as Fifth Circuit precedent applying *Heck* to parole proceedings. (*Id.*)   According to Defendants, under that precedent, if plaintiffs allege a specific error in a parole case (rather than a general challenge to parole proceedings), then the action is barred by *Heck*. (*Id.* at 5–6.)

Defendants assert that Plaintiff is not bringing a general challenge to parole proceedings but claims an error in a specific case. (*Id.* at 6.)  Specifically, Plaintiff seeks an order "invalidating the Committee's May 7th decision to rescind its prior decision granting parole and the Committee's subsequent May 10th decision to deny Plaintiff's parole application." (*Id.*)  Further, Defendants contend that "this federal suit is to be released from incarceration onto parole." [sic] (*Id.*)  Defendants rely on *Fields v. Hooper*, No. 18-707, 2019 WL 3520517, at *3 (M.D. La. Apr. 23, 2019), *report and recommendation adopted*, No. 18-707, 2019 WL 3502910 (M.D. La. Aug. 1, 2019), which they claim is almost identical to the instant case. (Doc. 16-1 at 6–7.)

### 2. Plaintiff's Opposition (Doc. 18)

Plaintiff responds that his action is not barred by *Heck*; "Because Mr. Sneed's action, if successful, will not demonstrate the invalidity of the criminal judgement against him, any reliance on *Heck* is misplaced." (Doc. 18 at 1.)  Plaintiff returns to the line of cases cited by Defendants and explains:

> Even where a favorable ruling may dramatically increase the likelihood of a prisoner obtaining release from confinement, or advance the date at which that prisoner will likely obtain such release from confinement, an action under 42 U.S.C. § 1983 remains a wholly appropriate vehicle to assert constitutional claims. Only where a favorable ruling would "necessarily demonstrate the invalidity of confinement or its duration" must a prisoner seek relief through the federal habeas corpus statute. [*Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005)].

(*Id.* at 2.)

Plaintiff continues, "To be sure, a ruling in Mr. Sneed's favor would, in all likelihood, speed his release from Louisiana State Penitentiary, but it would not necessarily demonstrate the unlawfulness of his current confinement." (*Id.* at 2.)  Plaintiff then refers to the Louisiana law and regulations purporting to show that, even after the Committee votes to release a prisoner, there is still a delay in which the Committee can reconsider its decision and in which the "prisoner must still clear various hurdles if he wants to be released from confinement." (*Id.* at 3.)  "Release from confinement, in other words, is never 'automatic' or immediate once a parole board has voted in a prisoner's favor, and a favorable vote from the parole board does not render all subsequent confinement invalid." (*Id.*)  Plaintiff then asserts:

> And this is why the relief Mr. Sneed seeks is not injunctive relief requiring his immediate release from Louisiana State Prison or a declaration that his imprisonment is unlawful; rather, he seeks an injunction preserving the *status quo ante*, before the Defendants' unconstitutional actions effectively nullified the effect of the Committee on Parole's March 15, 2021 vote granting Mr. Sneed his

> parole. By enjoining the actions of May 7 and/or May 10, the Court
> would not be declaring the invalidity of Mr. Sneed's imprisonment.
> It would simply restore Mr. Sneed to the place he was before the
> peculiar, and unconstitutional, actions of the Defendants occurred
> last month: on his way to (very likely, but not automatically) coming
> home. In this regard, Mr. Sneed is no different than the prisoners
> who prevailed in *Dotson*, and very much unlike the prisoner in *Heck*
> whose suit necessarily challenged the lawfulness of his conviction.

(*Id.* at 3–4.)

Plaintiff next attempts to distinguish *Fields* on numerous grounds.  Principally, Plaintiff

argues, in *Fields*, the prisoner's parole was revoked following a conviction of prison misconduct,

and plaintiff wanted the parole board to reconsider the decision. (*Id.* at 5.)

Plaintiff then moves to Defendants' argument that the matter should be "punt[ed] . . . to

habeas proceedings." (*Id.* at 6.)  Plaintiff responds by relying on this Court's decision in *Thomas*

*v. LeBlanc,* No. 18-496, 2019 WL 1086358 (M.D. La. Mar. 7, 2019) (deGravelles, J.):

> [T]his very Court correctly rejected such an expansive reading of
> *Thomas*, properly holding that an individual defendant *could*
> challenge the actions of the Committee on Parole in his individual
> case (*Jeffrey v. Owens* notwithstanding). *See Thomas*[, *supra* at \*8]
> ("Thus, this case is much closer to *Wilkinson* and *Hunter* than to
> *Jeffrey*. . . ."). Likewise in this case, although Mr. Sneed's case is
> unique and unprecedented in many respects, the case does not
> involve simply a "challenge [to] a specific error in the denial of [an
> individual prisoner's] parole." *Id.* at \*6. Rather, the basic
> contentions at the center of Mr. Sneed's case turn on a state policy
> of general import: Defendants claim that (under their own policies,
> applied to Mr. Sneed and others) they have unfettered authority to
> revoke anyone's parole at any time unburdened by any
> constitutional constraints, whereas Mr. Sneed argues this parole
> practice and policy is contrary to the U.S. Constitution.

(Doc. 18 at 6.)

Lastly, Plaintiff argues that he references another parole hearing that will happen in the

coming months and seeks injunctive relief "barring 'future unconstitutional conduct at the hearing

state officials intend to hold in the coming months.' " (*Id.* at 6–7 (quoting *FAC* ¶¶ 75, Prayer, Doc.

12 at 22, 27.)  Thus, if Plaintiff stated a viable claim, *Heck* should not bar claims for prospective relief. (*Id.* at 7 (citing *Hunter v. Owens*, 375 F. App'x 427, 429 (5th Cir. 2010).)

### 3. Defendants' Reply (Doc. 20)

After Defendants describe Plaintiff's arguments as "semantical," "lengthy and often circuitous," they focus on "several admissions and acknowledgements that factually and legally foreclose any further discussion regarding this issue." (Doc. 20 at 2.)  Defendants quote Plaintiff's contention (stated above) that a ruling in his favor would speed his release and that enjoining the Committee's actions on May 7 and May 10 would simply restore him to where he was the preceding month: "on his way to (very likely, but not automatically) coming home." (*Id.* (quoting Doc. 18 at 2, 4).)  According to Defendants, Plaintiff's argument that this does not constitute "immediate release" is foreclosed by Supreme Court and Fifth Circuit precedent, which apply *Heck* and require a writ of habeas corpus even if the prisoner seeks "speedier release." (*Id.* at 2–3 (citations omitted).)

Defendants next dispute Plaintiff's attempt to "shoehorn his case into the very narrow exception to the *Heck* doctrine as set forth in *Wilkinson v. Dotson*[.]" (*Id.* at 3.)  Defendants again quote the *FAC*, which alleges that the Committee's actions constituted a "bizarre and lawless parole revocation unlike any other in Louisiana history" (*Id.* (quoting *FAC*, Doc. 12 at 1).)  Defendants hammer that Plaintiff's relief relates "solely and specifically to the Committee's decisions to rescind its prior decision granting parole (May 7) and to deny Plaintiff's parole application (May 10), which decisions Plaintiff alleges were 'unlike any other in Louisiana history.' " (*Id.* at 3-4.)  Plaintiff's efforts to change these allegations into a broader attack on general parole procedures are, for Defendants, "nonsensical and directly contradicted by all of Plaintiff's allegations." (*Id.* at 4.)

Defendants next contend that *Thomas v. LeBlanc* actually supports their position.  (*Id.*) According to Defendants, *Thomas* involved an inmate challenging his eligibility for parole under state law, not a specific decision by the Committee. (*Id.*)  Further, plaintiff in *Thomas* sought only a new hearing in which the Committee could exercise its discretion. (*Id.*)

> Thus, as the Court aptly noted, the plaintiff's claims in *Thomas* were "much closer" to those analyzed in *Wilkinson* (seeking solely a new parole eligibility review or new discretionary hearing before parole board) and *Hunter* (challenging retroactive application of new Texas parole statute and seeking only a new parole hearing). [*Thomas*, 2019 WL 1086358,] at *8-9 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) and *Hunter v. Owens*, 375 F. App'x 427, 429 (5th Cir. 2010)(unpublished)).

(*Id.*)  According to Defendants, this case is more like *Jeffrey v. Owens*, 216 F. App'x 396 (5th Cir. 2006), which *Thomas* discussed, and *Serio v. Members of Louisiana State Bd. of Pardons*, 821 F.2d 1112 (5th Cir. 1987), which *Thomas* cited, where plaintiffs complained of specific errors in their parole hearings and sought release. (*Id.* at 4–5.)

Before concluding, Defendants address the prospective relief argument as follows:

> Finally, to the extent that Plaintiff, in trailing, mentions a "new hearing" in the "coming months" and throws in a request barring "future unconstitutional conduct", Plaintiff has wholly failed to set forth credible allegations that this alleged Committee action was due to a written or even unwritten policy or that there is any likelihood of similar actions at some, as of yet unknown dated future hearing.

(*Id.* at 5.)

## B. Applicable Law

The Court agrees with the parties that *Thomas v. LeBlanc* squarely governs this issue. In *Thomas*, this Court laid out the standards governing the *Heck* issue, which the Court will quote at length:[1]

> The Supreme Court "has held that a prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.' " *Wilkinson v. Dotson*, 544 U.S. 74, 78, 125 S. Ct. 1242, 1245, 161 L. Ed. 2d 253 (2005) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973); *Wolff v. McDonnell*, 418 U.S. 539, 554, 94 S. Ct. 2963, 41 L.Ed. 2d 935 (1974); *Heck v. Humphrey*, 512 U.S. 477, 481, 114 S. Ct. 2364, 129 L.Ed. 2d 383 (1994); *Edwards v. Balisok*, 520 U.S. 641, 648, 117 S. Ct. 1584, 137 L.Ed. 2d 906 (1997) ). "He must seek federal habeas corpus relief (or appropriate state relief) instead." *Id.* The *Wilkinson* court traced the case law on this issue, summarizing it as follows:
>
> > Throughout the legal journey from *Preiser* to *Balisok*, the Court has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody. Thus, *Preiser* found an implied exception to § 1983's coverage where the claim seeks—not where it simply "relates to"—"core" habeas corpus relief, *i.e.*, where a state prisoner requests present or future release. Cf. *post*, at 1253 (KENNEDY, J., dissenting) (arguing that *Preiser* covers challenges that "relate ... to" the duration of confinement). *Wolff* makes clear that § 1983 remains available for procedural challenges where success in the action *would not necessarily* spell immediate or speedier release for the prisoner. *Heck* specifies that a prisoner cannot use § 1983 to obtain damages where success *would necessarily* imply the unlawfulness of a (not previously invalidated) conviction or sentence. And *Balisok*, like *Wolff*, demonstrates that habeas

---

[1] The Court ordinarily eschews such extensive block quoting from a prior opinion, but, given the egregious allegations of the operative complaint and the considerable need for prompt resolution of this motion, the Court will do so in this case.

remedies do not displace § 1983 actions where success in the civil rights suit would not necessarily vitiate the legality of (not previously invalidated) state confinement. These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.

*Wilkinson*, 544 U.S. at 81–82, 125 S. Ct. at 1247–48.

However, in *Wilkinson*, the Supreme Court found that prisoners had cognizable claims under § 1983 because they sought "relief that [would] render invalid the state procedures used to deny parole eligibility . . . and parole suitability. *Id.*, 544 U.S. at 82, 125 S. Ct. at 1248 (citing *Wolff v. McDonnell*, 418 U.S. 539, 554–55, 94 S. Ct. 2963, 41 L.Ed. 2d 935 (1974) ). Neither of the inmates in *Wilkinson* sought "an injunction ordering his immediate or speedier release into the community," and "a favorable judgment [would] not 'necessarily imply the invalidity of their convictions or sentences.' " *Id.* (citations and alterations omitted). The Supreme Court explained:

> Success for [inmate] Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application. Success for [inmate] Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term.

*Id.* (citations omitted).

Several Fifth Circuit cases have followed *Wilkinson.* For example, in *Hunter v. Owens*, 375 F. App'x 427 (5th Cir. 2010) (per curiam), the Fifth Circuit vacated a district court's order dismissing an *ex post facto* claim by an inmate challenging the retroactive application of a Texas statute. *Id.* at 429. The Fifth Circuit found that the inmate sought "only prospective injunctive relief requiring that the Parole Board apply the prior parole law of review by a three-member panel to his future parole hearings and requiring Texas to grant him a special parole review." *Id.* The Fifth Circuit also stated: "Because

the parole board has the discretion to deny parole, the relief Hunter seeks would not necessarily require immediate or speedier release for Hunter. Therefore, the district court erred in holding that Hunter's claim was precluded by *Heck*." *Id.* (citing *Dotson*, 544 U.S. at 82, 125 S. Ct. 1242); *see also Kyles v. Garrett*, 353 F. App'x 942, 946 (5th Cir. 2009) (per curiam) (reversing granting of summary judgment on inmate claim for prospective injunctive relief based on *Dotson*, and relief upon by *Hunter* ).

Conversely, in *Jeffery v. Owens*, 216 F. App'x 396, 397 (5th Cir. 2006) (per curiam), the Fifth Circuit dismissed a complaint for failure to state a claim when the inmate was "not making a general challenge to parole procedures" but rather "alleged a specific error in his case—that the Board wrongly considered arrests which had been expunged to deny him parole." *Id.* at 397. Plaintiff had "sought a declaratory judgment that the consideration of those arrests was error and that the error was the sole reason for the denial of parole." *Id.*

Similarly, in *Hampton*, the magistrate judge recommended dismissal of a claim with respect to plaintiff's revocation proceeding. The plaintiff complained that, in 2010, he had not been told that he would not receive credit for time he spent on supervised release and that, had he known this, he would not have waived his right to a formal revocation hearing before the Parole Board. *Hampton*, 2011 WL 6936411, at *2. Plaintiff also complained of the fact that, in 2011, the Parole Board denied an application for rehearing, allegedly using procedures not in place at the time he committed his original offense. *Id.*

In recommending dismissal of plaintiff's claims, the magistrate judge explained: " '[I]f a prisoner challenges a single hearing as constitutionally defective, he must first exhaust state habeas remedies." *Id.* at *3 (citing *Serio v. Members of the Louisiana State Bd. of Pardons*, 821 F.2d 1112, 1117 (5th Cir. 1987)). "This is so even if the result of such a challenge would not entitle the plaintiff to earlier release but would only entitle him to a new hearing with proper procedural protections." *Id.* (citing *Serio, supra*). The magistrate judge concluded that the claim warranted dismissal because Plaintiff sought an injunction "voiding his waiver of a formal parole hearing, vacating the decision of the Parole Board which revoked his supervised release, and granting him a 'new revocation hearing conducted under constitutionally proper procedures." *Id.* The magistrate concluded: "As such, he challenges the specific outcome of his parole revocation proceedings and seeks a new hearing in connection therewith. Pursuant to *Serio*, the

plaintiff must first pursue this claim in a habeas corpus proceeding in state court and may not pursue federal habeas corpus relief until he has exhausted his state court remedies." *Id.* Since Plaintiff had not exhausted these remedies, his claim was dismissed. *Id.*

Nevertheless, in *Hampton*, the magistrate judge went on to liberally construe plaintiff's claim "as a challenge to the Parole Board's general procedures" under the Due Process and *Ex Post Facto* clauses. *Id.* (citing *Jeffrey, supra*). The magistrate judge ultimately recommended dismissal of both claims for failure to state a claim, and the district judge approved this recommendation. *Id.*, 2011 WL 6936411, at *3–4 (M.D. La. Nov. 18, 2011), *report and recommendation approved*, 2011 WL 6941682 (M.D. La. Dec. 31, 2011).

*Thomas*, 2019 WL 1086358, at *6–8.

### C.  Analysis

The Court finds that the parties have seized on the key issue from *Thomas*.  On the one hand, if Plaintiff is alleging that Defendants made specific errors in his parole proceeding and seeks an order that necessarily requires immediate or speedier release or that necessarily implies the unlawfulness of the State's custody, then his claims are barred by *Heck. See Thomas*, 2019 WL 1086358, at *8.  If, on the other hand, Plaintiff is "making an attack on the general parole procedures and not on the specific outcome of his parole hearing," and if success for Plaintiff "means at most a new parole hearing at which [Louisiana] parole authorities may, in their discretion, decline to shorten his prison term," then the action is not barred by *Heck. See id.* (internal citations omitted).  The main question for this motion is into which of these two categories the *FAC* falls.

Having carefully considered the matter, the Court finds that the *FAC* falls into the first category that is barred by *Heck*.  As Defendants argue, Plaintiff's allegation that his parole revocation was "unlike any other in Louisiana history," (*FAC*, Doc. 12 at 1) strongly indicates that he is attacking the outcomes of two specific proceedings.  Moreover, although Plaintiff complains

27

about a host of procedural irregularities in the May 7, 2021, "hearing"[2] and the May 10, 2021,

proceeding,[3] all of these problems, reprehensible though they are, appear to be *sui generis* to

Plaintiff's revocation (again, one "unlike any other in Louisiana history" and one which appears

to violate Louisiana law in many respects)).   Thus, because Plaintiff challenges errors in single

hearings, not "general parole procedures," his claims are barred by *Heck*.

 Plaintiff attempts to rebut this in his opposition by stating:

> Although Mr. Sneed's case is unique and unprecedented in many
> respects, the case does not involve simply a challenge to a specific
> error in the denial of an individual prisoner's parole. . . . Rather, the
> basic contentions at the center of Mr. Sneed's case turn on a state
> policy of general import: Defendants claim that (under their own
> policies, applied to Mr. Sneed and others) they have unfettered
> authority to revoke anyone's parole at any time unburdened by any
> constitutional constraints, whereas Mr. Sneed argues this parole
> practice and policy is contrary to the U.S. Constitution.

(Doc. 18 at 6 (cleaned up).)   Unfortunately, "the basic contentions" are simply not asserted in the

operative complaint; rather, as amply demonstrated above, Plaintiff focuses on the numerous ways

in which his case is "unique and unprecedented." Ultimately, "a motion to dismiss is evaluated on

the operative complaint, not a plaintiff's opposition." *Apollo Energy, LLC v. Certain Underwriters

at Lloyd's, London*, 387 F. Supp. 3d 663, 677–78 (M.D. La. 2019) (deGravelles, J.) (citing, *inter

alia*, *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 806

(5th Cir. 2012) (stating that, on a Rule 12(b)(6) motion, "a court assesses the legal sufficiency of

---

[2] These errors in the May 7, 2021, "hearing" include (1) that there was no "vote" but rather only a unilateral decision by Marabella; (2) that no Committee members were given advanced notice of the action; (3) that the Board of Parole would not share any information with Plaintiff; and (4) there was no record of this *ex parte* proceeding. (*FAC* ¶ 45, Doc. 12.)

[3] These procedural irregularities in the May 10, 2021, proceeding include that (1) there were off the record communications, (*FAC.* ¶ 54, Doc. 12); (2) no formal notice was provided from the Secretary or "anyone else", (*id.* ¶ 55–59); (3) no continuance was provided, (*id.* ¶ 60), (4) the Committee refused to consider the Disciplinary Board's record, (*id.* ¶ 61); (5) the Committee refused to let Plaintiff speak through counsel despite his having suffered a stroke, (*id.* ¶ 62–63); (6) the Committee refused to allow Plaintiff an opportunity to call witnesses or introduce evidence, (*id.* ¶ 66); and (7) the Committee punished him for refusing the "plea bargain," (*id.* ¶ 68). (*See also id.* ¶ 82 (listing procedural deficiencies).)

the complaint"); *Becnel v. St. Charles Par. Sheriff's Office*, No. 15-1011, 2015 WL 5665060, at *1 n. 3 (E.D. La. Sept. 24, 2015) (refusing to consider "new factual allegations" presented by plaintiff in her opposition to defendants' motion to dismiss because " '[i]t is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss.' " (citing *In re Enron Corp Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011)).

Nevertheless, the Court notes that, while the *MTD II* must be judged by the allegations of the *FAC* and its attachments, key statements in the Plaintiff's opposition also support the Court's conclusion. Plaintiff argues, "To be sure, a ruling in Mr. Sneed's favor would, in all likelihood, speed his release from Louisiana State Penitentiary, but it would not necessarily demonstrate the unlawfulness of his current confinement." (Doc. 18 at 2.) The first clause concedes that a decision in Plaintiff's favor would speed his release, which brings Plaintiff's claims under *Heck*. The second clause, where Plaintiff tries to thread the needle, is plainly contradicted by Plaintiff's later statement that he is seeking to be restored to "the *status quo ante*" before the May 7th and 10th hearings. (Doc. 18 at 3–4.) Contrary to Plaintiff's arguments, this is clearly an effort which "seek[s] to invalidate the duration of [his] confinement—[both] *directly* through an injunction compelling speedier release [and] *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." *See Thomas*, 2019 WL 1086358, at *7 (quoting *Wilkinson*, 544 U.S. at 81–82). But, as shown above, this requires exhaustion through state habeas.

Plaintiff's reliance on his claim for prospective relief also fails. "[I]f a prisoner challenges a single hearing as constitutionally defective, he must first exhaust state habeas remedies." *Thomas*, 2019 WL 1086358, at *8 (quoting *Hampton*, 2011 WL 6936411, at *2. (citing *Serio*, 821 F.2d at 1117)). "This is so even if the result of such a challenge would not entitle the plaintiff to earlier release but would only entitle him to a new hearing with proper procedural protections." *Id.*

29

(citing *Serio*, 821 F.2d at 1117)). Consequently, because Plaintiff's claim necessarily attacks and seeks the invalidity of the May 7th and May 10th hearings, he must first exhaust his remedies.

Plaintiff's reliance on *Thomas* falls short as well, for, as Defendants argue, *Thomas* in fact supports their position. In *Thomas*, this Court found that the plaintiff was "making an attack on the general parole procedures and not on the specific outcome of his parole hearing." *Id.* at *8. This Court cited the allegation that " 'Clearly, DPSC has arbitrarily modified its internal regulations' such that the department is improperly prohibiting geriatric parole based on an incorrect interpretation of [Louisiana law]." *Id.* This Court concluded:

> Thus, this case is much closer to *Wilkinson* and *Hunter* than to *Jeffrey.* Like the plaintiffs in *Wilkinson*, Plaintiff is *not* seeking an order for "his immediate or speedier release into the community." *Id.*, 544 U.S. at 82, 125 S. Ct. at 1248. At most, like the *Wilkinson* inmate, Plaintiff will obtain "a new parole hearing at which [Louisiana] parole authorities may, in their discretion, decline to shorten his prison term." *Id.*; *see also Hunter*, 375 F. App'x at 429 ("Because the parole board has the discretion to deny parole, the relief Hunter seeks would not necessarily require immediate or speedier release for Hunter. Therefore, the district court erred in holding that Hunter's claim was precluded by *Heck*."); *Kyles v. Garrett*, 353 F. App'x at 946 ("Kyles seeks relief that will 'render invalid the state procedures used to deny ... parole suitability' but does not seek 'an injunction ordering his immediate or speedier release into the community.' Like the *Dotson* plaintiff, success for Kyles 'means at most a new parole hearing at which [Texas] parole authorities may, in their discretion, decline to shorten his prison term.' Under *Dotson*, Kyles is not precluded by *Heck* from litigating his § 1983 claim." (internal citations to *Dotson* omitted) ). Moreover, unlike *Jeffrey*, when the Plaintiff complained of the specific error of wrongfully considering arrests to deny him parole, *id.*, 216 F. App'x at 397, here Plaintiff attacks the facts that he was found to be ineligible for parole and was denied a hearing in the first place.
>
> Ultimately, success for the Plaintiff in this case would not "necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81–82, 125 S. Ct. at 1247–48. Plaintiff seeks prospective injunctive and declaratory relief; he would simply be deemed eligible for parole and given a new

> hearing, at which time the Parole Board could, in its discretion, deny
> Plaintiff the relief he seeks. Consequently, under *Wilkinson*,
> Defendant's motion to dismiss for failure to exhaust must be denied.

*Id.* at *8–9.  Conversely, here, Plaintiff is not merely seeking parole eligibility or a ruling which would allow the Committee to exercise their discretion as they see fit.  Rather, as Plaintiff plainly argues, he seeks a restoration of the status quo *before* the May 7th and 10th hearings, an order which would necessarily (and admittedly) lead to his speedier release and invalidate those prior hearings.

The Court also agrees with Defendants that this case is analogous to *Serio*.  There, plaintiff alleged that the Louisiana State Board of Pardons violated his constitutional right to be free from retaliation when the Board denied him parole substantially in part because he had previously filed lawsuits against prison officials. *Serio*, 821 F.2d at 1113.  He sought, in part, "an order enjoining Board members from repeating this practice." *Id.*  The district court dismissed his complaint as frivolous because, among other reasons, he failed to exhaust state remedies. *Id.*  The Fifth Circuit affirmed, holding that the "claims for injunctive relief, being, in effect, an attack on the propriety of a single defective hearing and seeking an earlier release from custody, cannot be asserted until state habeas corpus remedies are exhausted." *Id.* at 1114.  Writing for the majority, Judge Rubin concluded:

> Although Serio does not seek release from confinement in his §
> 1983 complaint and resolution of his § 1983 claim would require
> only that the trial court find that his previous litigiousness played a
> "substantial"—but not necessarily a "decisive"—role in the Parole
> Board's decision, he patently challenges a "single allegedly deficient
> hearing" within the meaning of *Alexander*. He therefore must
> initially pursue his claims through habeas corpus with its attendant
> exhaustion requirement.

*Id.* at 1119.

Similar reasoning applies here.  Plaintiff seeks injunctive and declaratory relief which are, essentially, "attack[s] on" two "defective hearing[s] and seek[s] an earlier release from custody[.]" *Id.* at 1114.  But, under binding Fifth Circuit precedent, he must first exhaust his state habeas remedies. *Id.*  Further, while the *Serio* plaintiff sought prospective relief in the form of preventing officials from repeating the unlawful practice, *id.* at 1113, this was not enough to save his claims from *Heck*, *id.* at 1119.  For this additional reason, Plaintiff's claims fail.

The Court also finds this case analogous to *Fields*, which Defendants also point to for support.  In *Fields*, plaintiff claimed that he was granted parole, but, on the next day, he "acted in a strange manner due to a medical condition." *Fields*, 2019 WL 3520517, at *2.  Plaintiff was later issued a disciplinary report and found guilty of a violation for intoxication. *Id.*  The disciplinary appeal was denied. *Id.*  Magistrate Judge Bourgeois then writes:

> The plaintiff was scheduled to be released on parole on February 21, 2015, but on March 12, 2015, the plaintiff was informed by defendant Ranatza that his parole had been revoked due to the aforementioned disciplinary violation. On June 22, 2015, pursuant to an administrative appeal, the disciplinary report was dismissed for lack of evidence. However, the plaintiff's parole was never reinstated despite multiple hearing requests by the plaintiff.

*Id*. The Magistrate Judge then found that plaintiff failed to state a claim against Ranatza.

> Turning to the plaintiff's claims against defendant Ranatza for revocation of and failure to reinstate parole, the plaintiff is alleging that a specific error was made in his case – that defendant Ranatza wrongly considered the dismissed disciplinary charge to deny him parole. He is not making a general challenge to parole procedures. The plaintiff is requesting injunctive, declaratory, and monetary relief for the actions of defendant Ranatza. Granting such relief would necessarily imply that his parole was revoked and subsequently denied in error. The plaintiff may not obtain such relief under § 1983 until the decision to deny him parole is reversed or otherwise called into question. As such, the plaintiff fails to state a claim against defendant Ranatza. *See Jeffery v. Owens*, 216 F. App'x 396 (5th Cir. 2006).

*Id* at *3.  Judge Jackson adopted the report and recommendation. *Fields*, 2019 WL 3502910, at *1.

The Court finds that *Fields* is on all fours to this case and that Plaintiff's efforts to distinguish *Fields* (on the grounds that that plaintiff was convicted of the underlying disciplinary violation or that it was unclear what that plaintiff sought) are belied by the above language from the case.  As in *Fields*, Plaintiff is in essence alleging that the Committee improperly revoked his parole after it had been granted because he had been issued a disciplinary charge for which he was ultimately vindicated. *See Fields*, 2019 WL 3520517, at *2. Like *Fields*, Plaintiff seeks relief which "necessarily impl[ies] that his parole was revoked and subsequently denied in error." *Id.* at *3.  And, as in that case, "[P]laintiff may not obtain such relief under § 1983 until the decision to deny him parole is reversed or otherwise called into question." *Id.*

For all these reasons, the Court finds that Plaintiff's claims are barred by the *Heck* doctrine. Consequently, Defendants' motion will be granted, and Plaintiff's claims will be dismissed.

## IV.    Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiff previously amended his complaint, he did not do so in response to a ruling by this Court assessing the sufficiency of his claims. Thus, "though [there is] a compelling case for denying leave to amend, the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff's request." *Watkins v. Gautreaux*, --- F. Supp. 3d ----, No.19-635, 2021 WL 309139, at *14 (M.D. La. Jan. 28, 2021) (deGravelles, J.) (citing *JMCB, LLC v. Bd. of Commerce & Indus*., 336 F. Supp. 3d 620, 641–42 (M.D. La. 2018) (deGravelles, J.); *Fetty v. Louisiana State Bd. of Private Sec. Examiners*, ⎯⎯ F. Supp. 3d ⎯⎯, No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *Murphy v. Bos. Sci.*

*Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, inter alia, *JMCB, supra*).

While sides are represented by able counsel, the Court cautions the parties in the following respect.  Plaintiff's situation is, by the allegations of the *FAC*, urgent; he remains "in fragile health." (*FAC* ¶ 74, Doc. 12.)  Thus, the Court asks both sides to make the next phase of pleadings as smooth as possible.  For example, the Court's research into this motion preliminarily revealed that, under recent Fifth Circuit caselaw, "A parole system by itself 'does not give rise to a constitutionally protected liberty interest in parole release,' " and that this circuit's "unpublished authority, which [it] [has found] persuasive . . . holds that Louisiana prisoners do not have a liberty interest in parole that is protected by the Due Process Clause," *Thomas v. LeBlanc*, 846 F. App'x 282, 283 (5th Cir. 2021) (per curiam) (cleaned up).  Consequently, Plaintiff should have a well-founded basis in law for asserting such a claim.  Similarly, if Plaintiff clears the *Heck* hurdle, he clearly appears to have alleged a First Amendment retaliation claim. (*See FAC* ¶¶ 40–42, 86–91, Doc. 12.)  And, finally, if Defendants raise qualified immunity, Plaintiff should be prepared to address that issue with respect to the seemingly unique vindictiveness claim.

Ultimately, the Federal Rules of Civil Procedure "should be construed, administered, and *employed* by the court and *the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1 (emphasis added).  This rule seems particularly applicable here, where the liberty of an incarcerated man in "fragile health" is at stake. (*FAC* ¶ 74, Doc. 12.)

## V.   Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(6)* (Doc. 16) filed by Defendants, the Louisiana Committee on Parole Executive Director Francis Abbott and Committee members Tony Marabella, Sheryl Ranatza, Jim Wise, Pearl Wise, and Alvin Rouche, Jr., is **GRANTED**, and Plaintiff's claims against Defendants are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff is hereby given fourteen (14) days in which to amend the operative complaint to cure the above deficiencies.  Failure to do so will result in judgment being entered and the case being closed.

Signed in Baton Rouge, Louisiana, on July 20, 2021.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**